**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(WEST PALM BEACH DIVISION)**

WALTER   AUTO   LOAN   TRUST;                    CASE NO.
AGORATRADE   LLC;   AGORATRADE
LLC as Trust Manager and Beneficiary of the
Walter Auto Loan Trust; AGORA DATA,
INC.; and WALT, LLC,

              Plaintiffs,

vs.

ATLANTIC   ACCEPTANCE   CORP,
ATLANTIC   ACCEPTANCE   HOLDINGS
LLC, and ATLANTIC AUTO FINANCE
GROUP,   BRUCE   BLACK,   individually,
RYAN ROCHEFORT, individually,

              Defendants.

_____/

## COMPLAINT FOR DAMAGES AND PRELIMINARY INJUNCTION

Plaintiffs WALTER AUTO LOAN TRUST, AGORATRADE LLC, AGORATRADE

LLC as Trust Manager and Beneficiary of the Walter Auto Loan Trust, AGORA DATA, INC.

("Agora"), and WALT, LLC (collectively "Plaintiffs"), by and through undersigned counsel, sue

Defendants ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS

LLC, and ATLANTIC AUTO FINANCE GROUP, LLC ("Atlantic"), BRUCE BLACK,

individually, and RYAN ROCHEFORT, individually (collectively "Defendants") and alleges:

## INTRODUCTION

This action arises from Atlantic's multiple material breaches of a Master Receivables

Agreement ("MRA") executed by the Parties wherein Atlantic would sell, transfer and assign to

Agora a portfolio of auto retail installment contracts ("RICs") Atlantic originated in exchange for

a negotiated price.  Defendants, Bruce Black and Ryan Rochefort, each individually guaranteed

performance of Atlantic's obligations under the MRA and is in breach of his personal guaranty to

Agora.   In addition to Atlantic's multiple material MRA breaches, Atlantic tortiously and unjustifiably interfered with Agora's relationships with the customers who purchased the vehicles related to the RICs by, among other things, failing to provide funding for the RICs which it purchased from automobile dealerships, failing to ensure all RICs were secured by perfected first lien on the vehicle's title and failing to notify the automobile dealerships which it purchased the RICs that Agora had purchased the RICs from Atlantic.   In addition to monetary damages, Agora seeks specific performance and a preliminary injunction ordering Defendants to cease their continuing material breaches and interference with Agora's business relationships that are resulting in significant harm to Agora and third-party consumers.   Defendants bad actions have caused and continue to cause immense strain and hardship on both Agora and the innocent consumers who purchased vehicles financed by RICs from Atlantic's automobile dealership partners.

## **PARTIES, JURISDICTION & VENUE**

1.      Agora is a Delaware Corporation with its principal place of business in Arlington, Texas.   Agora is the sole member and manager of AgoraTrade, LLC which is the Trust Manager and beneficiary of Walter Auto Loan Trust.   Walter Auto Loan Trust is a Delaware trust. AgoraTrade, LLC is a Texas limited liability company with its principal place of business in Arlington, Texas.   Walt, LLC is a Delaware limited liability company.   AgoraTrade, LLC is the sole common member and beneficiary of Walt, LLC

2.      Atlantic Acceptance Corp. is a for-profit corporation duly organized under the laws of the state of Florida with its principal place of business in Palm Beach County, Florida.

3.      Atlantic Acceptance Holdings, LLC is an administratively dissolved Florida limited liability company with its principal place of business in Palm Beach County, Florida.

4.      Atlantic Auto Finance Group, LLC is a limited liability company duly organized under the laws of the state of Florida with its principal place of business in Palm Beach County, Florida.

5.      Bruce Black is an individual over 18 years old, a resident of Palm Beach County, Florida and is not (under information and belief) in the military service of the United States or its allies.

6.      Ryan Rochefort is an individual over 18 years old, a resident of Palm Beach County, Florida and is not (under information and belief) in the military service of the United States or its allies.

7.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      The Court has personal jurisdiction over Defendants as they are organized under Florida law, maintain their principal place of business, reside, and are conducting business, in Palm Beach County, Florida.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in Palm Beach County, Florida.

10.      Venue is appropriate in Palm Beach County, Florida, because this is the county where the Defendants reside and/or conduct business, where the causes of action accrued and where the property in dispute is located.

## CONDITIONS PRECEDENT AND RETENTION OF COUNSEL

11.     All conditions precedent to this action have occurred, have been waived, or have been otherwise excused.

12.     Agora has retained undersigned counsel to represent its interests in this matter and has agreed to pay its counsel a reasonable fee for services rendered.

## GENERAL ALLEGATIONS

13.     Agora is a financial technology company that provides independent automobile dealerships and finance companies with loan performance analytics and affordable access to capital.

14.     Defendants provide consumer financing for the purchase of automobiles from dealers with whom Defendants conduct business.   When the dealers' customers purchase vehicles on credit, they execute a RIC, that specifies the customer's monthly payments and makes clear that if the customer defaults under the RIC the vehicle may be repossessed and sold.

15.     On or about June 17, 2022, Walter Auto Loan Trust and Defendants executed an MRA whereby Defendants agreed to "sell, transfer, assign, set over and otherwise convey to Plaintiffs … all right title and interest in, to and under" several portfolios of RICs Defendants originated. A redacted copy of the MRA is attached as **Exhibit 1** to the Complaint.

16.     On or about September 30, 2022, Walt LLC and Defendants executed a second MRA whereby Defendants agreed to "sell, transfer, assign, set over and otherwise convey to Plaintiffs … all right title and interest in, to and under" several portfolios of RICs Defendants originated. A redacted copy of the MRA is attached as **Exhibit 2** to the Complaint.

17.     Pursuant to the MRAs, Defendants sold several portfolios of RICs originated by them to Plaintiffs.   Once a portfolio of RICS is sold, all of Defendants' right, title and interest in,

to and under the portfolio is transferred to Plaintiffs as of the "Closing Date" as such term is defined in the MRAs.

18.     As an express condition of the MRAs, each portfolio sold to Plaintiffs would be classified as a "True Sale" for purposes of the Uniform Commercial Code - meaning that at the time of the closing of the purchase, the RICs purchased by Plaintiffs were no longer Defendants' property.

19.     Plaintiffs purchased multiple portfolios of Receivables from Defendants. Receivables are defined by the MRAs as the RICs or Contracts, subject of the MRAs purchased by and transferred to Plaintiffs.

20.     Shortly after Plaintiffs purchased the portfolios of Receivables, the customers who purchased the vehicles were informed of the sale and assignment of the RICs and were informed where payments should be directed in the future. (The customers are referred to in the MRAs as "Obligors").

21.     As part of the sale of the portfolios, Plaintiffs took possession of the original RICs executed by the Obligors which evidence the Receivables. Such originals constitute "tangible chattel paper" under the Uniform Commercial Code ("UCC"). Plaintiffs' taking possession of the chattel paper perfected the sale as required under the UCC.

22.     Plaintiffs own these original RICs and the Receivables.

23.     Plaintiffs paid good and valuable monetary consideration to Defendants when it, in good faith, purchased the Receivables from Defendants and took possession of the original RICs representing the Receivables in the ordinary course of Plaintiff's business.  Indeed, Plaintiffs became a bona fide purchaser of the Receivables when it purchased and obtained possession of them.

24.     Plaintiffs, through their agent, Westlake Services LLC ("Westlake"), began servicing the RICs that were sold to Agora.

25.     Notice of the transfer in ownership and servicing was sent to the Obligors using the "Form Notice of Transfer" attached as Exhibit D to the MRA.

26.     The Notice of Transfer specifies to the Obligors where they would make payments on their RICs going forward.   The Notice of Transfer further specifies that the payments were to be made to Westlake.

27.     The MRA contains multiple terms, representations, and warranties made by Defendants in favor of Agora.   The most relevant of which are set forth as follows:

### SPECIFIC TERMS, REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MRA

28.     Pursuant to Section 2.2 of the MRAs governing the Purchase Price:

> the parties agree that the related Purchase Price shall be satisfied by (a) Agora (1) remitting or causing its agent to remit the amount required to be delivered to the applicable Prior Lender(s), if any, as described in the related release substantially in the form of the release attached hereto as Exhibit E and (2) in Agora's sole discretion, either (x) remitting or causing its agent to remit to the Deposit Account or (y) netting or causing its agent to net from any amounts otherwise distributable to Originator the sum of any portion of the related Net Advance Remittance, if any, in excess of the amount required to be delivered to the applicable Prior Lender(s), if any, (b) with respect to the related Portfolio sold on the initial Closing Date, transferring the related ORI to the [Defendants] and the [Defendants'] acceptance thereof and (c) with respect to the related Portfolio sold on any other Closing Date, by the increase in value of the ORI following the sale and allocation of such Portfolio to the applicable ORI.

> With respect to the applicable Closing Date, Agora shall own and be entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered) accruing before the related Cut-Off-Date, if such amounts were not posted to the Receivable prior to the related Cut-Off Date, together with (1) all

principal due and owing on the Receivables related to such Portfolio, (2) all Accrued Interest on the Receivables related to such Portfolio; and (3) all other charges or payments due and owing and collections on the Receivables related to such Portfolio, in each case from and after the related Cut-Off Date, a portion of which will be held by Agora for further distribution for the benefit of the [Defendants] in accordance with the terms hereof and the documents related to each applicable Financing.

29.     Pursuant to Section 2.6 of the MRAs:

[Defendants'] acknowledge[] and agree[] that, consistent with Agora's ownership of any Conveyed Property after the related Closing Date, Agora shall have the sole right to service, administer and collect the Conveyed Property and to assign or delegate such right to others, including without limitation, the Portfolio Administrator and the Servicer. Notwithstanding the foregoing, [Defendants] and Agora agree that [Defendants] shall, if instructed or permitted by Agora, maintain "customer service" communications with each Obligor provided, however, that such communications shall not include any attempt by or on behalf of the [Defendants] to collect or make demands of such Obligor with respect to the related Receivable unless expressly permitted by Agora.

30.     Defendants made multiple representations and warranties regarding the Receivables to Plaintiffs in the MRAs.   Specifically, under Section 4.2(a) of the MRAs, Defendants warranted:

Each Receivable (A) was originated by [Defendants] or an Affiliate of [Defendants] or was originated by a third party and purchased by [Defendants], in each case in accordance with [Defendants'] credit policies as of the date of origination or acquisition and in the ordinary course of [Defendants'] business and, as applicable, as validly assigned, (B) was originated for the retail sale of a Financed Vehicle in the ordinary course of the [Defendants'] business, or third party's ordinary course of business, as applicable, and was fully and properly executed by the parties thereto, and the [Defendants] or third party, as applicable, had all necessary licenses and permits to originate Receivables in the State where such [Defendants] [were]located, (C) contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for realization against the collateral security, and (D) is a

Receivable which provides for level monthly payments (provided that the period in the first period and the payment in the final period of the Receivable made by minimally different from the normal period and level payment) which, if made when due, shall fully amortize the Amount Financed over the original term.

31.     Pursuant to Section 4.2(d), Defendants warranted:

Each Receivable represents the genuine, legal, valid and binding payment obligation of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except (A) as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditor's rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law and (B) as such Receivable may be modified by the application after the Cut-Off Date of the Servicemembers Civil Relief Act, the California Military Families Financial Relief Act or similar legislation; and all parties to each Receivable had full legal capacity to execute and deliver such Receivable and all other documents related thereto and to grant security interest purported to be granted thereby.

32.     Additionally, Section 4.2(j), Defendants warranted:

There is only one original executed copy (or with respect to Electronic Contracts, one Authoritative Copy) of each Contract and there has not ever been any other original or Authoritative Copy of such Receivable.

33.     Pursuant to Section 4.2(o) Defendants warranted:

Each receivable created or shall create a valid, binding and enforceable first priority security interest in favor of the [Defendants] in the Financed Vehicle. The Certificate of Title for each Financed Vehicle shows, or if a new or replacement Certificate of Title is being applied for with respect to such Financed Vehicle the Certificate of Title will be received within 90 days of the origination of the related Receivable and will show, the [Defendants], or if directed by Agora, such other entity so specified by Agora in its sole discretion named as the original secured party under each Receivable as the holder of a first priority security interest in such Financed Vehicle. With respect to each Receivable for which the Certificate of Title has not yet been returned from the Registrar of Titles, [Defendants] [have] applied for or received

written or electronic evidence that such Certificate of Title showing [Defendants] as first lienholder has been applied for and [Defendants'] security interest (assigned by [Defendants] to Agora) has been validly assigned by the [Defendants] to Agora and reflected on the AgoraCapital Platform and immediately upon the transfer and assignment of the Receivables to Agora on the Closing Date, Agora shall have good and marketable title to the Receivables and, free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest or other right or title of any other Person. As of the Cut-Off Date, there were no Liens or claims for taxes, work, labor or materials affecting a Financed Vehicle which are or may be Liens prior to equal to the Liens of the related Receivable.

34.     Section 2.8 specifically provides

(a) The Originator hereby expressly acknowledges and agrees that any distributions otherwise distributable to Originator under the Originator Residual Instrument, shall be reduced by the related Debt Service, Servicing Expense, Pass Through Fees, Other Billables, and Transaction Fees.   In addition, Originator hereby expressly acknowledges and agrees that if any Originator Default occurs, (i) Agora shall retain and holdback (or cause to be retained and held back ) all distributions otherwise distributable to the Originator Residual Instrument (such holdback the "Originator Default Cash Trap") on and after the occurrence of any Originator Default, (ii) Agora shall deduct any funds in such Originator Default Cash Trap to permit Agora to (x) remit amounts owed to any Issuer in connection with any Financing (including in connection with any borrowing base deficiencies and/or margin calls), (y) effect a repurchase on behalf of the Originator pursuant to Section 6.4(a)(i) and/or (z) retain and treat any funds in such Originator Default Cash Trap as indemnity payment(s) made by Originator pursuant to its obligations in Section 7.16 hereof, (iii) such Originator Default Cash Trap will continue until any and all Originator Defaults have been cured as determined by Agora in exercise of its sole discretion, (iv) any remaining funds in the Originator Default Cash Trap following such cure of all Originator Defaults shall be distributable to the Originator Residual Instrument and (v) if a an Originator Default occurs and continues, Agora reserves the right to exercise other remedies including, without limitation, sell Receivables in order to satisfy Originator's obligations hereunder.

(b)     To the extent distributions otherwise due to Originator are less than the aggregate amount of Debt Service, Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and

Transaction Fees due from Originator to Agora in any Collection Period, then Originator shall have the right, but not the obligation to take such action, including, without limitation, contribution of additional capital to Agora, in order to permit Agora to perform its obligations under this Agreement.

(c)     Notwithstanding clause (b) above, Originator agrees that it shall have the obligation to pay all Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and Transaction Fees to the extent distributions are insufficient to pay such amounts and that Agora, ADI or any respective Affiliate thereof shall be permitted to deduct from distributions otherwise payable to Originator, hereunder or in any other agreement and also invoice Originator directly, such amounts as are necessary to satisfy any remaining amount of unpaid all Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and Transaction Fees. To the extent any deductions are insufficient, Agora shall invoice the Originator for the amounts of any such deficiency.

35.     The MRAs provide under Section 3.3(d):

In the event [Defendants] fails to deliver to the Servicer (or such Person as the Portfolio administrator directs), with respect to any particular Receivable, the related Receivable File to the reasonable satisfaction of the Portfolio Administrator and in accordance with this Section, the Portfolio Administrator shall provide written notice to [Defendants] of such failure.  If, after five (5) Business Days from the date of receipt of such notice, [Defendants] fails to cure such failure, the Portfolio Administrator may at its sole option require [Defendants] to repurchase such Receivable, [Defendants] shall repurchase such Conveyed Property by paying to Agora the related Repurchase Price in good funds within two (2) Business Days following the Portfolio Administrator's notice hereunder.  In the event [Defendants] is required to repurchase the applicable Conveyed Receivable hereunder, the Portfolio Administrator shall cause the Servicer to deliver to [Defendants], following Agora's receipt of payment from the [Defendants] of the related Repurchase Price, the related Receivable File and shall cause the assignment to [Defendants] all of Agora's right, title and interest in and to the related Conveyed Property, free and clear of any and all claims, liens, and encumbrances, except for those which existed at the time of Agora's purchase thereof from [Defendants].

36.     Pursuant to Section 3.3(e), Defendants covenanted:

[Defendants] shall deliver, via electronic mail or via the AgoraCapital Platform's messaging function, to the Portfolio Administrator and Agora immediately upon receipt (and in no event later than two (2) business days) any notices received by [Defendants] regarding any Receivables identified on any Receivable Schedule. Such notices shall include but not be limited to; impound notices, seizure notices, mechanic liens, bankruptcy filings and any other notices affecting the Receivables or Financed Vehicles identified on the related Receivable Schedule. The [Defendants] acknowledge[] and agree[] that for purposes of satisfying [Defendants'] obligations under this Section 3.3(e), that any such notice shall not be deemed delivered to Agora or the Portfolio Administrator unless and until Agora or the Portfolio Administrator has provided confirmation of receipt of such notice. The [Defendants] shall bear the burden of proof of demonstrating that [Defendants have] satisfied [their] obligations of delivery per the standards set forth in this Section 3.3(e).

37.    Pursuant to Section 6.4(c) of the MRAs provides that

**[DEFENDANTS ARE] <u>STRICTLY PROHIBITED FROM TAKING ANY ACTION OR COMMUNICATING WITH AN OBLIGOR UNTIL THE APPLICABLE STEPS RELATING TO REPURCHASE DESCRIBED IN THIS SECTION 6.4(a) HAVE BEEN COMPLETED AND AGORA HAS REASSIGNED TO [DEFENDANTS] THE VEHICLE TITLE AND RECEIVABLE. THIS INCLUDES BUT IS NOT LIMITED TO, REPOSSESSION OF THE VEHICLE OR COLLECTION EFFORTS BY [DEFENDANTS] WITH THE OBLIGOR</u>**

38.    Section 7.7 of the MRAs provide that the MRAs "shall be governed by and construed in accordance with the laws of the state of New York. However, the individual torts pled below, occurred in the State of Florida and are governed by Florida law.

## DEFENDANTS' FAILURE TO FUND DEALERS

39.    As stated above, automobile dealerships contract with Defendants to fund consumer loans to customers to purchase vehicles.

40.    After the customers execute the RIC, the dealer immediately assigns the RIC to the Defendants, which is noted on the RIC.

41.    Defendants subsequently sell the RIC to Plaintiffs, which remits the funds to the

Defendants.

42.     Defendants are required to pay the automobile dealerships upon assignment of the RIC but Defendants failed to do so.

43.     When Plaintiffs requested from Defendants proof of payments to the automobile dealerships, Plaintiffs were provided with falsified and inaccurate ACH forms.   Upon further investigation by Plaintiffs, the automobile dealerships had not been funded.

44.     Plaintiffs exercised its right to demand that Defendants repurchase certain RICs sold to Agora in the amount of $$466,753.80. The demand letter is attached as **Exhibit 3.**

45.     To make matters worse, each day additional automobile dealerships come forward and advise Agora that the Defendants failed to fund their deals, whereby increasing the repurchase amount.

## FAILURE TO DELIVER TITLE & FAILURE TO ASSURE VALID FINANCE TRANSACTIONS

46.     The MRAs require a valid certificate of title for each vehicle that serves as collateral for the portfolio of RICs that are transferred to Agora that notes it holds a valid first security lien. Ex. 1, § 4.2(o).

47.     Despite the foregoing MRA requirements, Plaintiffs have discovered Defendants have failed to perfect Plaintiffs' liens, or have released a lien without Plaintiffs' express, written permission.

48.     Defendants have failed to deliver clear marketable title to multiple vehicles for RICs purchased and funded by Plaintiffs.   Defendants also failed to deliver to Plaintiffs certificates of title with the Receivable files for multiple vehicles in the Portfolios.   Defendants

were provided with multiple notices of these failures prior to the filing of this lawsuit and Defendants failed to cure these material breaches.

49.    Each of the foregoing events constitutes a material breach of the MRA, and Defendants are required to repurchase these Receivables from Plaintiffs.  Additionally, Defendants are required to remit the payoff amounts due for the repurchase of these Receivables.

## INTERFERENCE WITH OBLIGORS

50.    As a material term of the MRAs, under Section 5.2(g), Defendants may not "contact any or communicate with any Obligor regarding such Obligor's obligations under a Receivable including, without limitation, communicate with or threaten any Obligor into believing the Financed Vehicle can be repossessed as related to any collateral protection insurance obligations of such Obligor."

51.    Further, under Section 6.4(c), Defendants are "strictly prohibited from taking any action or communicating with an Obligor" unless and until Agora the repurchase process has been completed and Agora has reassigned to the Defendants the certificate of title and RIC.

52.    Despite these very clear and unambiguous terms, Defendants and the automobile dealerships have directly communicated with Obligors, or otherwise interfered with Agora's business relationship with the Obligors.

53.    These material breaches of the MRAs interfere with Plaintiffs' relationships with their Obligors and Plaintiffs' ability to properly service the Receivables resulting in damages to Plaintiffs and potentially to the Obligor.

54.    These communications, and failure to advise Plaintiffs of these communications, also evidence a deceptive and misleading business practice by Defendants where the Defendants

take advantage of Plaintiffs and capitalize on Defendants' ability to retain funds, the bulk of which they are not entitled to keep, causing it damages.

55.     On December 13 2022, Plaintiffs sent to Defendants a Demand for Payment of Amounts Due and to Cease and Desist Actions outlining the multiple breaches set forth above and demanding immediate repayment of previously funded RICs that Defendants failed to remit to dealers; ensure all RICs are secured by a vehicle with a perfected first lien in the Defendants' name and assigned to Plaintiffs, or an Agora entity; cease any release of lien without Plaintiffs' express, written consent; and timely forward any and all notices pursuant to the MRA provisions. Exhibit 2.

## COUNT I
## BREACH OF MRA

56.     Agora realleges and re-avers paragraphs 1 through 55 above, as if fully set forth herein.

57.     As stated above, the parties executed the MRAs that would govern the sale of Receivables from Defendants to Plaintiffs.   Defendants made multiple promises, representations and warranties in connection with the MRAs.

58.     Defendants materially breached multiple MRAs terms including, without limitation, sections 2.2, 2.6, 4.2(a), 4.2(d), 4.2(j), 4.2(o), 2.8, 3.3(d), 3.3(e), 5.2(g) and 6.4 as detailed above.

59.     Plaintiffs have been substantially damaged by these material breaches including, but not limited to: a) Defendants' retention of the funds paid by Plaintiffs for purchase of the Receivables; b) Defendants' failure to fund the Receivables Agora purchased from Defendants; c) Defendants' failure to repurchase the Receivables despite Plaintiffs' demand; d) Defendants'

failure to secure marketable title to the vehicles jeopardizing the security interest in the vehicles; e) Defendants deprivation of Plaintiffs and the Obligor's rights to the vehicles that secure the Receivables; f) damages for failure to remit the payoff amounts of the vehicles repurchased by Defendants; g) the disruption of Plaintiffs' ability to properly service the Receivables; h) the potential legal claims the Obligors may have against Plaintiffs and their servicer as a result of Defendants' actions; i) placing more than $14,000,000 worth of Receivables in distress; and j) the attorney's fees and costs in bringing the instant complaint.

**WHEREFORE,** Plaintiffs demand judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees pursuant to MRA § 7.16, and for any other relief this Court deems just and proper.

<u>**COUNT II**</u>
<u>**SPECIFIC PERFORMANCE**</u>

60.     Plaintiffs re-allege and re-avers paragraphs 1 through 55 above, as if fully set forth herein.

61.     This is an action for specific performance of the MRA executed by the parties.

62.     On June 17, 2022, Walter Auto Loan Trust and Defendants executed an MRA whereby Defendants agreed to "sell, transfer, assign, set over and otherwise convey to Plaintiffs … all right title and interest in, to and under" several portfolios of RICs Defendants originated.

63.     On September 20 2022, Agora and Defendants entered into a written contract for the sale and purchase of the Receivables (as defined above) from Defendants to Agora.

64.     Defendants materially breached multiple MRA terms.

65.     Defendants have failed to tender to Agora payments for the repurchase of RICs that Defendants failed to fund to the dealers despite having been paid by Agora, in the amount of $466,753.86.   Defendants have failed to remit these payments despite Agora's demand.

66.     Defendants have failed to secure marketable title to multiple vehicles that serve as collateral to the Receivables Agora purchased.   Defendants' failure to do so causes continuing material damages to Agora and impairment of Agora's ability to properly service the RICs.

67.     Defendants have released security liens on vehicles that serve as collateral to the Receivables Agora purchased without receiving Agora's express, written permission.

68.     Defendants have interfered with Agora's contractual relationships with the Obligors by failing to fund the dealers, resulting in the vehicle's repossession, and directly affecting Agora's ability to service the RICs.

69.     On December 13, 2022, Plaintiffs sent Defendants a Demand for Payment of Amounts Due and for specific performance of the foregoing obligations under the MRA.

70.     Defendants refused to cooperate with Plaintiffs and failed to comply with Plaintiffs' demand.

**WHEREFORE,** Plaintiffs seek a final judgment for specific performance requiring Defendants to:

1)     Remit sufficient funds to repurchase RICs they have not funded to the dealers and Plaintiffs could no longer service in the amount of $466,753.86;

2)     Fund all dealers on all RICs sold, assigned, or pledged to Plaintiffs, and any of its affiliates and subsidiaries in the approximate amount of $2,601,034.34;

LIEBLER, GONZALEZ & PORTUONDO
Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130    (305) 379-0400

3) Ensure all RICs are secured by a vehicle with a perfected first lien in the Defendants' name and assigned to Plaintiffs, or an Agora entity;

4) Prohibit Defendants from releasing any lien on a vehicle that serves as collateral for a RIC without Plaintiffs' express, written permission;

5) Refrain from interfering with Agora's relationships with the Obligors and the Dealers; and

6) Timely forward any and all notices pursuant to the MRA provisions;

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

71. Plaintiffs re-allege and re-avers paragraphs 1 through 55 above, as if fully set forth herein.

72. To state a claim for tortious interference with a business relationship, a plaintiff must show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985).[1]

73. There exist numerous business relationships between Plaintiffs and the Obligors. As discussed above, Plaintiffs purchased Portfolios of Receivables that comprise of RICs between Defendants and individuals who purchased vehicles from automobile dealers, which Defendants purportedly funded.

---

[1] Florida courts have determined tortious interference with a business relationship and tortious interference with a contract are nearly identical causes of action, with the "only material difference" being "in one there is a contract and in the other there is only a business relationship." *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).

74.     As of the date of purchase, all right title and interest in, to, and under the Retail Instalment Sales Contracts were transferred to Plaintiffs and Plaintiffs became a bona fide purchaser.   Plaintiffs' agent, Westlake, began servicing the Retail Instalment Sales Contracts.

75.     Defendants are undoubtedly aware of Plaintiffs' relationships with the Obligors because Defendants sold the Receivables to Plaintiffs by virtue of the MRA.

76.     Defendants intentionally interfered with Plaintiffs' relationships with the Obligors by:

(a) Failing to tender to dealers the funds for the purchase of the subject vehicles, despite having received the funds from Plaintiffs;

(b) Retaining all monies Plaintiffs paid for the Receivables, which caused multiple automobile dealerships to repossess the vehicles from the Obligors; and

(c) Failing to secure marketable title to multiple vehicles that serve as collateral to the Receivables purchased by Plaintiffs.

77.     The Defendants' conduct is unjustified because it is expressly prohibited by the MRA and causes harm to the Obligors that Plaintiffs service.

78.     Additionally, Defendants' actions have interfered with, and resulted in, the breach of numerous RICs between Plaintiffs and Obligors including, but not limited to: a) Obligors' failure to maintain possession of the vehicles; b) failure to make payment under the RICs; c) jeopardizing Plaintiffs' interest in the vehicles.

79.     Plaintiffs have been materially damaged by these actions including, but not limited to: a) Defendants' retention of funds intended to pay the dealers; b) the disruption of Plaintiffs' ability to properly service the Receivables; c) Defendants' failure to repurchase the receivables despite Plaintiffs' demand; d) Defendants' failure to secure marketable title to the vehicles

jeopardizing the security interest in the vehicles; e) Defendants deprivation of Plaintiffs and the Obligor's rights to the vehicles that secure the Receivables; f) the Obligor's breaches under the RICs; g) the potential legal claims the Obligors may have against Plaintiffs and their servicer as a result of Defendants' actions; h) placing more than $14,000,000 worth of Receivables in distress and i) the attorney's fees and costs in bringing the instant complaint.

**WHEREFORE,** Plaintiffs demand judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees and for any other relief this Court deems just and proper.

## <u>COUNT IV</u>
## <u>VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT</u>

80.     Plaintiffs re-alleges and re-avers paragraphs 1 through 55 above, as if fully set forth herein.

81.     In order to state a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") a consumer must plead: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006); *Washington v. LaSalle Bank Nat'l Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011)

82.     Defendants have assigned numerous RICs to Plaintiffs, for which Plaintiffs remitted funds.   Defendants retained the monies and failed to fund the dealers.

83.     Pursuant to the MRA's terms, Defendants were required to repurchase those RICs and remit sufficient funds to Plaintiffs in the amount of $466,753.86.

84.     Defendants made numerous promises and assurances to Plaintiffs they would remit these funds.   These were false and deceptive statements because Defendants have failed, and continue to fail, to remit these funds.

85.     Additionally, on a daily basis, dealers alert Plaintiffs additional vehicle sales have not been funded by the Defendants, demonstrating this is not an isolated incident, but showing a pattern of pervasive deceit.

86.     Plaintiffs have been materially damaged by these actions by jeopardizing more than $14,000,000 worth of Receivables by including, but not limited to: a) Defendants' failure to remit sufficient funds to repurchase RICs Agora has funded, but Defendants failed to satisfy the dealers; b) the disruption of Plaintiffs' ability to properly service the Receivables c) Defendants' deprivation of Plaintiffs and the Obligor's rights to the vehicles that secure the Receivables; d) the potential legal claims the Obligors may have against Plaintiffs and its servicer as a result of Defendants' actions; and e) the attorney's fees and costs in bringing the instant complaint.

**WHEREFORE,** Plaintiffs demand judgment for damages against Defendants together with interest, late charges, penalties, consequential damages, special damages, costs and attorneys' fees and for any other relief this Court deems just and proper.

<u>**COUNT V**</u>
<u>**PRELIMINARY INJUNCTION**</u>

87.     Plaintiffs re-alleges and re-avers paragraphs 1 through 55 above as if fully set forth herein.

88.     This is an action for a preliminary injunction.   Pursuant to Rule 65, the Court may issue a preliminary injunction if a plaintiff demonstrates that (i) there is a substantial likelihood of success on the merits, (ii) a substantial threat of irreparable injury, (iii) that the threatened injury to the plaintiff outweighs the potential harm to the defendant and (iv) that the injunction will not disserve the public interest.   *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

89.     All of the elements for the imposition of a preliminary injunction are present here.

90.     Plaintiffs submit that there is a substantial likelihood of success on the merits because, as detailed above, Defendants are engaged in continuing breaches of the MRAs and continuing to interfere with Plaintiffs' business relationships with the Obligors causing Plaintiffs great detriment. Plaintiffs have been significantly damaged and more than $14,000,000 worth of Receivables are in distress.

91.     The Defendants' conduct is unjustified because it is expressly prohibited by the MRAs.

92.     There is a substantial threat of irreparable injury to Plaintiffs and to the public at large.  Plaintiffs are being continually harmed by Defendants' pattern of deceit by retaining all funds remitted by Plaintiffs, that are intended to fund the dealers' sales of the subject vehicles, which ultimately causes a direct and deleterious effect on Plaintiffs' relationship with the Obligors by, including and without limitation:

(a) Failing to tender to Plaintiffs payments for the repurchase of the RICs that Defendant failed to fund to the dealers;

(b) Failing to tender required payments to dealers;

(c) Failing to secure marketable title to multiple vehicles that serve as collateral to the Receivables purchased by Plaintiffs;

(d) Refraining from releasing security liens on the vehicles that serve as collateral for the RICs Plaintiffs purchased without the express written permission of Plaintiffs; and

(e)     Timely forwarding any and all notices pursuant to the MRAs provisions.

93.      Absent an injunction, Plaintiffs have no adequate remedy at law and will suffer irreparable harm, which is presumed under Florida law because of Agora's claim for tortious interferences of a business relationship.  *Special Purpose Accts. Receivable Coop. Corp. v. Prime*

*One Cap. Co., LLC*, 125 F. Supp.2d 1093, 1105 (S.D. Fla. 2000) ("…irreparable injury is presumed in cases involving tortious interference with business relationship").

94.     Defendants will not be harmed by the requested injunction.  The granting of the temporary injunction will merely keep the parties bound to the terms of the MRA that they negotiated and agreed to.   Moreover, the conduct enjoined will prohibit further harm to third party Obligors.

95.     The injunction sought will serve the public interest because it seeks to protect the interests of third-party Obligors as well as Plaintiffs' during the pendency of this lawsuit. Indeed, the requested injunction will help restore the certainty to the types of receivable financing transactions involved here, including assuring consumers of financed vehicles that are subject of such transactions that their vehicles will not be wrongfully repossessed.

**WHEREFORE,** Plaintiffs seek an order granting Agora's request for preliminary injunction requiring Defendants to:

1)  Enjoin Defendants from retaining funds paid by Plaintiffs;

2)  Pay the outstanding obligations to dealers for the sales of vehicles that serve as collateral for RICs Agora purchases;

3)  Enjoin Defendants from advising customers to voluntary repossess their vehicles and then selling them another vehicle;

4)  Enjoin Defendants from assigning RICs secured by a vehicle to Plaintiffs without perfecting a first lien in Defendants' name and assigned to Plaintiffs, or an Agora entity;

5)  Enjoining Defendants from transferring or releasing any liens on vehicles securing RICs sold to Plaintiffs;

6)  Enjoin Defendants from all actions, inactions, and omissions, that would directly or indirectly adverse Plaintiffs' relationship with the Obligors; and

7)  Enjoin Defendants from communicating with consumers other than normal customer service unrelated to the servicing of the Retail Installment Sales Contracts.

<u>**COUNT VI BREACH OF PERSONAL GUARANTY**</u>
<u>**(Bruce Black)**</u>

96.      Plaintiffs re-allege and re-avers paragraphs 1 through 55 above as if fully set forth herein.

97.      On September 30, 2022, Bruce Black executed a Limited Personal Guaranty ("Personal Guaranty") absolutely, irrevocably, and unconditionally guaranteeing Atlantic Acceptance Corp.'s, Atlantic Acceptance Holdings, LLC's, and Atlantic Auto Finance Group, LLC's MRA obligations. A copy of Personal Guaranty is attached to the MRA as Exhibit "I-1".

98.      More specifically, Bruce Black absolutely, irrevocably, and unconditionally guaranteed the obligation to deliver, prior to any Closing Date, a) the original Contract, or, if lost, a copy of the Contract; and b) the certificate of title or other such documents that indicate the subject vehicle is owned by the Obligor and subject to a first lienholder interest by the Defendants.

99.      Plaintiffs are the owner and holder of the Personal Guaranty.

100.     Bruce Black breached the Personal Guaranty by, without limitation, failing to satisfy all of the Defendants' obligations as set forth more fully herein and as set forth in paragraphs 56, 66, 75, 77, 82, 88, 91.

101.     As a result of Bruce Black's breach, Plaintiffs have been significantly damaged and more than $14,000,000 worth of Receivables are in distress.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants for compensatory and special damages, costs, interest, attorney's fees pursuant to the Personal Guaranty, an immediate, preliminary injunction, plus all other relief that is necessary and just.

## COUNT VI BREACH OF PERSONAL GUARANTY
### (Ryan Rochefort)

102.     Plaintiffs re-allege and re-avers paragraphs 1 through 55 above as if fully set forth herein.

103.     On September 30, 2022, Ryan Rochefort, executed a Limited Personal Guaranty ("Personal Guaranty") absolutely, irrevocably, and unconditionally guaranteeing Atlantic Acceptance Corp.'s, Atlantic Acceptance Holdings, LLC's, and Atlantic Auto Finance Group, LLC's MRA obligations. A copy of each such Personal Guaranty is attached to the MRA as Exhibit "I-1".

104.     More specifically, Ryan Rochefort absolutely, irrevocably, and unconditionally guaranteed the obligation to deliver, prior to any Closing Date, a) the original Contract, or, if lost, a copy of the Contract; and b) the certificate of title or other such documents that indicate the subject vehicle is owned by the Obligor and subject to a first lienholder interest by the Defendants.

105.     Plaintiffs are the owner and holder of the Personal Guaranty.

106.     Ryan Rochefort breached the Personal Guaranty by, without limitation, failing to satisfy all of the Defendants' obligations as set forth more fully herein and as set forth in paragraphs 56, 66, 75, 77, 82, 88, 91.

107.     As a result of Ryan Rochefort's breach, Plaintiffs have been significantly damaged and more than $14,000,000 worth of Receivables are in distress.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants for compensatory and special damages, costs, interest, attorney's fees pursuant to the Personal Guaranty, an immediate, preliminary injunction, plus all other relief that is necessary and just.

## DEMAND FOR ATTORNEY'S FEES

Agora hereby demands its attorney's fees and costs in connection with the institution of this lawsuit as provided by Section 7.16 of the MRA and Florida law as cited herein.

Respectfully submitted,

*/s/ James R. Liebler, II* _____
J. RANDOLPH LIEBLER
Florida Bar No. 507954
Email: JRL@lgplaw.com
JAMES R. LIEBLER, II
Florida Bar No. 115348
Email: JRLII@lgplaw.com
IRA SCOT SILVERSTEIN
Florida Bar No. 0009636
Email: ISS@lgplaw.com
**LIEBLER, GONZALEZ & PORTUONDO**
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, FL   33130
Telephone: (305) 379-0400
Fax: (305) 379-9626
*Attorneys for Plaintiffs*