# EXHIBIT 2

MASTER RECEIVABLES AGREEMENT

among

**ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS LLC, and ATLANTIC AUTO FINANCE GROUP,**

and

WALT, LLC

Dated as of September 28, 2022

WALT Master Receivables Agreement

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................. 1

SECTION 1.1     Definitions ............................................................................. 1
SECTION 1.2     Usage of Terms ..................................................................... 12
SECTION 1.3     Calculations .......................................................................... 12

ARTICLE II PURCHASE AND SALE ............................................................................... 12

SECTION 2.1     Agreement to Transfer ......................................................... 12
SECTION 2.2     Purchase Price ...................................................................... 12
SECTION 2.3     No Assumption of Obligations Relating to Conveyed Property ................. 13
SECTION 2.4     True Sales ............................................................................. 13
SECTION 2.5     Effect of Payment of Purchase Price .................................... 14
SECTION 2.6     Servicing of Receivables and Related Security .................... 15
SECTION 2.7     AgoraCapital Platform ......................................................... 15
SECTION 2.8     Originator ............................................................................. 15

ARTICLE III CONDITIONS TO PURCHASE ................................................................. 16

SECTION 3.1     Conditions Precedent to Effectiveness of this Agreement ........... 16
SECTION 3.2     Conditions Precedent to Purchase ........................................ 16
SECTION 3.3     Deliverables ......................................................................... 18

ARTICLE IV REPRESENTATIONS AND WARRANTIES ............................................ 19

SECTION 4.1     Representations and Warranties of Originator ...................... 19
SECTION 4.2     Representations and Warranties of Originator With Respect to Each Receivable ......................................................................... 22

ARTICLE V GENERAL COVENANTS OF ORIGINATOR ......................................... 26

SECTION 5.1     Affirmative Covenants ......................................................... 26
SECTION 5.2     Negative Covenants ............................................................. 28

ARTICLE VI ADDITIONAL RIGHTS AND OBLIGATIONS IN RESPECT OF THE CONVEYED PROPERTY ........................................................................ 29

SECTION 6.1     Rights and Obligations of Agora .......................................... 29
SECTION 6.2     Contribution ......................................................................... 29
SECTION 6.3     Mandatory Delivery ............................................................. 30
SECTION 6.4     Repurchase of Receivables .................................................. 30
SECTION 6.5     Power of Attorney ................................................................ 32
SECTION 6.6     Assignment of Contract Rights between Originator and Third Parties. ...... 32
SECTION 6.7     Devices ................................................................................. 33

ARTICLE VII MISCELLANEOUS .................................................................................. 33

i

SECTION 7.1    Advice of Counsel...............................................................33
SECTION 7.2    Amendment.........................................................................33
SECTION 7.3    Waivers ..............................................................................33
SECTION 7.4    Notices ...............................................................................33
SECTION 7.5    Costs and Expenses.............................................................34
SECTION 7.6    Survival...............................................................................34
SECTION 7.7    Governing Law; Jurisdiction and Venue ............................34
SECTION 7.8    Counterparts.  Effect of Electronic Agreement...................35
SECTION 7.9    Further Assurances..............................................................35
SECTION 7.10   Assignment .........................................................................35
SECTION 7.11   Entire Agreement ...............................................................35
SECTION 7.12   Confidentiality ...................................................................35
SECTION 7.13   Severability of Provisions ..................................................36
SECTION 7.14   No Partnership or Joint Venture; No Origination ...............36
SECTION 7.15   Non-Public Information ......................................................36
SECTION 7.16   Indemnification...................................................................36
SECTION 7.17   No Petition ..........................................................................37

EXHIBITS AND SCHEDULES

EXHIBIT A    Contents of Receivable Files
EXHIBIT B    Contents of Electronic Data File
EXHIBIT C    Form of Notice of Transfer to be Sent to Obligor
EXHIBIT D    Limited Power of Attorney
EXHIBIT E    Form of Release
EXHIBIT F    ACH Withdrawal Authorization Agreement Form
EXHIBIT G    List of Authorized Originator Representatives
EXHIBIT H    Deposit Account Information
EXHIBIT I    Limited Personal Guaranty

ii

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

## MASTER RECEIVABLES AGREEMENT

This MASTER RECEIVABLES AGREEMENT, dated as of September 28, 2022 (this "Agreement"), is made among **ATLANTIC ACCEPTANCE CORP**, a Florida corporation, having an office at 700 S. Rosemary Square #204-B55, West Palm Beach, FL 33401, **ATLANTIC ACCEPTANCE HOLDINGS LLC**, a Florida limited liability company, and **ATLANTIC AUTO FINANCE GROUP**, a Florida corporation both having an office at 800 Village Sq Crossing, Palm Beach Gardens, FL 33410, as seller (collectively, jointly and severally "Originator"), and Walt, LLC, a Delaware limited liability company having an office at 700 West Arkansas Ln, Suite 150, Arlington, TX 76013, as purchaser ("Agora").

### PRELIMINARY STATEMENT

WHEREAS, Originator owns, and from time to time will acquire and/or originate Receivables (as defined below);

WHEREAS, from time to time, the Originator desires to contribute Receivables for inclusion in the AgoraCapital Platform;

WHEREAS, from time to time, Originator desires to sell to Agora for further contribution to the related Issuer in connection with a Financing, all of Originator's right, title and interest in and to the Receivables and Related Security set forth on the related Receivables Schedule on a servicing-released basis, on the terms and conditions set forth below;

WHEREAS, for each Closing Date, the parties shall update the AgoraCapital Platform to reflect additional terms, conditions and any further specific obligations with respect to the related Portfolios;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### ARTICLE I
### DEFINITIONS

**SECTION 1.1**     **Definitions**.  Whenever used in this Agreement, the following terms shall have the following meanings:

"Accrued Interest" means, as of any date of determination with respect to any Receivable, the accrued and unpaid interest of such Receivable.

"Advance Amount" shall mean, with respect to each Receivable, the amount as set forth in the AgoraCapital Platform, which shall equal the product of the (a) the related Advance Rate and (b) related Unpaid Principal Balance of such Receivable as of the related Cut-off Date.

"Advance Amount Accrued Interest" shall mean, with respect to each Receivable that satisfies the Portfolio Eligibility Criteria, the product of (a) the Advance Amount outstanding as of the first day of the related Collection Period, (b) the applicable Originator Participation Rate divided by (c) twelve (12).

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

"Advance Rate" shall mean, with respect to each Receivable, the applicable rate (expressed as a percentage) as set forth in the AgoraCapital Platform.

"Adverse Claim" means any claim of ownership interest or any Lien.

"ADI" shall mean Agora Data, Inc. and any successors and assigns.

"Additional Servicing Compensation" means certain fees and expenses reimbursable, and other amounts payable to the Servicer.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. A Person shall not be deemed to be an Affiliate of any Person solely because such other Person has the contractual right or obligation to manage such Person unless such other Person controls such Person through equity ownership or otherwise.

"Aggregate Portfolio Advance Amount" shall mean, with respect to each Portfolio, the aggregate of the Advance Amounts of each Receivable included in such Portfolio, as set forth in the AgoraCapital Platform, less the amount of any Portfolio or any Receivable that does not satisfy the Portfolio Eligibility Criteria.

"Agora" has the meaning set forth in the preamble.

"Agora's Operating Agreement" means that certain limited liability company agreement of Walt, LLC dated as of May 4, 2022, as amended, restatements, supplemented or otherwise modified from time to time.

"AgoraCapital Participant" means an approved participant of the AgoraCapital Platform that (i) has executed and delivered all documents, certificates and other materials required by the AgoraCapital Policies and Procedures and (ii) is in good standing as a participant of the AgoraCapital Platform.

"AgoraCapital Platform" means ADI's (or an affiliate thereof) online technology for the analysis, monitoring, valuation, financing, modeling, validation, benchmarking, peer analysis and exchange of assets (including, without limitation, (i) all "help tickets", "chat communications", messaging and other communication applications, (ii) any file transfer protocol ("ftp") site hosted or, maintained, established or monitored by ADI or an affiliate thereof, (iii) other written statements, notices, reports, agreements, terms of use, or engagements between ADI and Originator related to the analysis, monitoring, valuation, reporting, financing and exchange of assets, and (iv) any other exchange of information).

"AgoraCapital Policies and Procedures" means those policies and procedures for the AgoraCapital Platform, as amended from time to time, including, without limitation, the "Terms of Use" and "Privacy Policy" as published and made available for review on the AgoraCapital Platform.

2

WALT Master Receivables Agreement

"Agreement" has the meaning set forth in the preamble.

"Amount Financed" means, with respect to a Receivable, the aggregate amount advanced under such Receivable toward the purchase price of the Financed Vehicle and any related costs, including amounts advanced in respect of accessories, insurance premiums, voluntary debt cancellation coverage addenda, other items customarily financed as part of motor vehicle retail installment contracts, and related costs.

"Authorized Officer" means, with respect to any Person, any of the Chief Executive Officer, the President, the Treasurer, the Chief Financial Officer, any Vice President or any Assistant Treasurer of such Person, or any other officer of such Person authorized to act on behalf of such Person.

"Authorized Originator Representative" means a principal, employee, agent or representative of the Originator as identified on Exhibit G hereto or on the AgoraCapital Platform.

"Business Day" means any day other than a Saturday or Sunday, or a day on which banking institutions in Delaware, New York, California or Texas are authorized or obligated by law or executive order to be closed.

"Closing Date" shall mean, with respect to each acquisition of a Portfolio by Agora, the related date set forth in the AgoraCapital Platform.

"Collection Period" means, with respect to each Payment Date, the immediately preceding calendar month (or in the case of the first Payment Date, the period from and including the initial Cut-Off Date through and including the last day of the calendar month immediately preceding the first Payment Date).

"Collections" means, with respect to any Receivable, all cash collections and other cash proceeds of or relating to such Receivable, including, without limitation, (i) Scheduled Payments, (ii) Prepayments, (iii) any Late Fees, (iv) any Guaranty Amounts, (v) any Insurance Proceeds, (vi) any Rebates, (vii) any Net Liquidation Proceeds or Recoveries, and (viii) all other cash proceeds of Related Security with respect to such Receivable.

"Conveyed Property" means each Receivable identified on the related Receivables Schedule which is sold, assigned or transferred to Agora on the related Closing Date pursuant hereto, together with the Related Security, as reflected on the AgoraCapital Platform.

"Contract" means a motor vehicle retail installment contract executed by an Obligor for a Financed Vehicle under which an extension of credit was made by the applicable Originator in the ordinary course of business to such Obligor, which is secured by such Financed Vehicle.

"Cut-Off Date" shall mean, with respect to the acquisition of a Portfolio by Agora, the related date set forth in the AgoraCapital Platform.

"Cut-Off Date Receivables Balance" shall mean, with respect to any Receivable, the related Unpaid Principal Balance as of the Cut-Off Date, as set forth in the AgoraCapital Platform.

3

WALT Master Receivables Agreement

"<u>Debt Service</u>" means a monthly amount calculated as the sum of (1) the aggregate Advance Amount Accrued Interest for all Receivables subject to his Agreement plus (2) the aggregate of the product of (a) the related Advance Rate and (b) the (excess of the (x) related Unpaid Principal Balance of all Receivables (other than Receivables that became Ineligible Receivables during the related Collection Period) as of the first day of the related Collection Period over (y) related Unpaid Principal Balance of all Receivables (other than Receivables that became Ineligible Receivables during the related Collection Period) as of the last day of the related Collection Period) plus (3) the Advance Amount for all Receivables that became Ineligible Receivables during the related Collection Period plus (4) any Debt Service Carry Forward.

"<u>Debt Service Carry Forward</u>" means with respect to any Payment Date, any remaining unpaid amount of Debt Service due on a prior Payment Date.

"<u>Defaulted Receivable</u>" means, with respect to any Collection Period, a Receivable for which, as of the last day of such Collection Period, (i) 10% or more of any scheduled payment remains unpaid for more than 60 days at the end of each Collection Period, (ii) the related Obligor is bankrupt or the subject of a bankruptcy proceeding, (iii) the related Financed Vehicle has been repossessed and the Servicer has liquidated or sold such Financed Vehicle and the Servicer has made a final determination of any deficiency owed under such Receivable or the Servicer has such Financed Vehicle in its repossession inventory past the expiration of the notice of intent to sell (NOI), or (iv) has been or is required to be charged-off or is deemed uncollectible by the Servicer in accordance with the Servicer's credit and collection policy then in effect. The Unpaid Principal Balance of any Receivable that becomes a Defaulted Receivable will be deemed to be zero as of the date it becomes a Defaulted Receivable.

"<u>Deposit Account</u>" shall mean that certain bank account of the Originator as specified in Exhibit H hereto.

"<u>Dollars</u>" means the lawful currency of the United States of America.

"<u>Draw</u>" means Originator's ability to, subject to Agora's review and approval, request the release of Excess Cash to Draw. Originator may submit a draw request only after the review period is completed. At Agora's sole discretion, a Draw may be made on the Payment Date in the amount of (i) the lesser of the end of the previous month's Excess Cash to Draw, or (ii) the lowest availability for Draw in the 10 days prior to the Draw request.

"<u>Electronic Data File</u>" means the information and data set forth in <u>Exhibit B</u> hereto.

"<u>Excess Cash to Draw</u>" means the amount available to Draw as listed on each Originator Monthly Certificate.

"<u>Financed Vehicle</u>" means an automobile, sport utility vehicle, light duty truck or van, or any other type of motor vehicle, together with all accessions thereto, securing an Obligor's indebtedness under the related Receivable.

"<u>Financing</u>" means any transaction involving a structured financing pursuant to a loan and security agreement, Securitization Refinance or other similar arrangement.

4

WALT Master Receivables Agreement

"<u>Governmental Authority</u>" means any federal, state, county, regional, local or municipal government, any bureau, department, agency or political subdivision thereof and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government (including any court) of the United States.

"<u>Guaranty Amounts</u>" means any and all amounts paid by any guarantor with respect to the applicable Receivable.

"<u>Ineligible Receivable</u>" means, with respect to any Collection Period, a Receivable as of the last day of such Collection Period, (i) that is a Defaulted Receivable, or for which (ii) 10% or more of any scheduled payment remains unpaid for 60 days or more at the end of each Collection Period (iii) the related Financed Vehicle has been repossessed, (iv) the related Financed Vehicle has been classified as "out for repossession," (v) the Receivable has become unsecured (e.g. lien loss), (vi) there is a partial charge-off or other final determination of a deficiency, (vii) is delinquent without payment arrangements from the Obligor that are acceptable to Agora, (viii) is subject to a voluntary or involuntary surrender, repossession, mechanic's lien, abandoned Financed Vehicle, impounded Financed Vehicle or seized Financed Vehicle, (ix) the related Financed Vehicle has been involved in a total loss without full insurance coverage, (x) the Obligor has "skipped" or cannot be contacted, (xi) the Receivable was the subject of a straw purchase, (xii) the Obligor is deceased, (xiii) the Obligor is the subject of a bankruptcy or similar proceeding, (xiv) the Obligor refuses to make payments, (xv) the discovery of false information on the credit application that materially affects the Obligor's ability to make payments (xxi) in the Portfolio Administrator's determination, such Receivable has become impaired, (xxii) any Receivable that does not satisfy the Portfolio Eligibility Criteria or results in a Portfolio Originator Default or (xxiii) any Receivable required to be repurchased hereunder and not repurchased in accordance with the terms hereof. For the avoidance of doubt, once a Receivable first becomes classified as an "Ineligible Receivable", such Receivable shall remain an Ineligible Receivable until the expiration of this Agreement.

"<u>Insurance Policy</u>" means, with respect to a Receivable, any insurance policy benefiting the holder of such Receivable providing loss or physical damage, credit life, credit disability, theft, mechanical breakdown or similar coverage with respect to the related Financed Vehicle or Obligor.

"<u>Insurance Proceeds</u>" means any proceeds from claims on any Insurance Policy.

"<u>Issuer</u>" means, in connection with any Financing, Agora or a subsequent transferee that issues securities to or enters into such Financing with third parties, with respect to which Portfolios serve as all or a portion of the related collateral.

"<u>Late Fees</u>" means, with respect to a Receivable, any late fees, prepayment charges, extension fees, modification fees, check by phone fees, ACH/EFT fees, any other incidental charges or fees received from an Obligor, including, but not limited to, collection fees and returned check charges or other administrative fees or similar charges allowed by applicable Law that are paid or payable by the Obligor.

"<u>Laws</u>" means, with respect to any Person, Receivable or action, as applicable, all federal, state and local statutes, rules, guidelines having the force of law, regulations, ordinances, codes

5

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

and administrative or judicial, and all applicable administrative orders, licenses, authorizations and permits of, and agreements with, any Governmental Authority to which such Person or Receivable, as applicable, or, in the case of any Person, any of its property is subject.

"Lien" means a security interest, lien, charge, pledge, equity or encumbrance of any kind.

"Material Adverse Effect" means, with respect to Originator, a material adverse effect on (a) the ability of Originator to perform its obligations under this Agreement or any other Purchase Document, (b) its financial condition, business, operations or properties, taken as a whole, or (c) the interests of Agora under this Agreement, any Receivable or any other Purchase Document.

"Monthly Key Portfolio Indicator" means any of the "monthly key portfolio indicators" as set forth on the AgoraCapital Platform.

"Net Advance Remittance" means, with respect to any Closing Date, the related Aggregate Portfolio Advance Amount for the related Portfolio less any amounts retained by Agora in order to satisfy any Debt Service, Servicing Expense, Pass Through Fees, Other Billables, and Transaction Fees obligations of the Originator.

"Net Liquidation Proceeds" means, with respect to a Defaulted Receivable and the Collection Period during which it became a Defaulted Receivable, an amount (which shall not be less than zero) equal to (i) all amounts realized, from whatever source (including Insurance Proceeds), with respect to such Defaulted Receivable during such Collection Period, minus (ii) the sum of (a) reasonable expenses incurred by the Servicer in connection with the collection of such Receivable and the repossession and disposition of the related Financed Vehicle (to the extent not previously reimbursed to the Servicer and exclusive of overhead) and (b) all payments required by applicable law to be remitted to the Obligor.

"Non-Cooperation Event" means a breach by Originator of its obligations as set forth in Section 6.2 herein, as determined in Agora's sole discretion.

"Obligor" on a Receivable means the purchaser or co-purchasers of the related Financed Vehicle and any other Person who owes payments under such Receivable, including any guarantor.

"Operating Procedures" means with respect to Originator, the administrative and operating procedures, if available, of Originator with respect to the acquisition and servicing of Receivables in effect on the date of this Agreement, as set forth in the Policies and Procedures.

"Originator" has the meaning set forth in the preamble.

"Originator Default" shall mean the occurrence of (a) any Portfolio Originator Default, (b) any breach of a representation, warranty, covenant, agreement or other obligation by the Originator hereunder, or under any other agreement to which such Originator, or an Affiliate thereof and Agora, or an Affiliate thereof are parties, (c) in connection with any Financing, with respect to any Other Originator, any portfolio Originator Default set forth in an Other Originator's master receivables agreement between such Other Originator and Agora, (d) in connection with any Financing, with respect to any Other Originator, any breach of a representation, warranty, covenant agreement or other obligation by an Other Originator under the applicable master receivables

6

WALT Master Receivables Agreement

agreement (and AgoraCapital Platform) between such Other Originator and Agora or under any other agreement to which such Other Originator, or an Affiliate thereof and Agora, or an Affiliate thereof are parties, (e) a default or event of default in any contract or agreement between Originator and any other third party, and (f) Non-Cooperation event.

"Originator Monthly Certificate" means an Originator Monthly Certificate in the form as set forth on the AgoraCapital Platform which shall be delivered by Agora to the Originator on a monthly basis pursuant to this Agreement.

"Originator Participation Rate" shall mean, with respect to each Receivable, as of the date such Receivable was transferred to Agora hereunder, the Specified Rate as set forth in the AgoraCapital Platform; provided, however, in Agora's sole discretion, in the event that the Prime Rate as in effect on any date of determination increases by two percent (2.00%) per annum or more from the Prime Rate as in effect on any prior Closing Date, or in the event of other material changes in prevailing market rates, Agora reserves the right to increase the respective Originator Participation Rate accordingly with respect to any so affected Receivables. Agora shall notify Originator in writing or through the AgoraCapital Platform of changes to the respective Originator Participation Rate.

"Originator's Servicer" shall mean, to the extent the Originator is not the related servicer, with respect to the acquisition of a Portfolio by Agora, the entity identified as the related prior servicer of such Portfolio (immediately prior to the related Closing Date) for the Originator in the AgoraCapital Platform.

"Originator Residual Instrument" or "ORI" (i) with respect to the Originator, that limited liability company preferred membership interest in Agora, as established under Agora's Operating Agreement, representing the Originator's rights to receive distributions related to each Portfolio sold by the Originator to Agora pursuant to the terms of this Agreement and the AgoraCapital Platform or (ii) with respect to any Other Originator, the instrument representing such Other Originator's rights to receive distributions related to the applicable portfolios sold by such Other Originator to Agora pursuant to the terms of a master receivables agreement and the AgoraCapital Platform; provided that such distributions shall have been reduced by the related Debt Service, Servicing Expense, Pass Through Fees, Other Billables and Transaction Fees as well as any trapping of distributions as a result of any Originator Default.

"Other Billables" means any unpaid amounts owed by Originator or any affiliate thereof payable to ADI or any affiliate thereof under any agreement between Originator or any affiliate thereof and ADI or any affiliate thereof.

"Other Originator" means any originator (other than the Originator) possessing either (x) an ORI or (y) a portion of a limited liability company or other ownership instrument representing a membership or other ownership interest in any entity established by or on behalf of ADI for the purposes of facilitating any Financing.

"Pass Through Fees" means the fees incurred by the Servicer related to the Portfolio or Portfolio Administrator for the servicing and management of the Receivables sold under this

7

WALT Master Receivables Agreement

Agreement, including, without limitation, any renewal fees and expenses with respect to any Device.

"Payment Date" means the 20th day of each calendar month or, if any such day is not a Business Day, the next succeeding Business Day.

"Payoff" means with respect to a Receivable, as of a date of determination, the sum of (i) the Unpaid Principal Balance, plus (ii) all accrued and unpaid interest calculated in accordance with the terms and conditions of the Contract.

"Person" means any individual, corporation, estate, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Policies and Procedures" means the policy and procedures handbook of Originator in effect on the related Closing Date, including but not limited to the Operating Procedures and such documentation of policies and procedures maintained by Originator in whatever form or fashion regarding the acquisition and servicing of Receivables.

"Portfolio" means each portfolio of Receivables which is sold by the Originator to Agora on a Closing Date pursuant to this Agreement and identified in the AgoraCapital Platform.

"Portfolio Administrator" shall mean Center Street Finance, L.P.

"Portfolio Eligibility Criteria" with respect to any Portfolio, shall have the meaning as set forth in the AgoraCapital Platform.

"Portfolio Originator Default" shall mean any breach of any Monthly Key Portfolio Indicator of the type set forth on the AgoraCapital Platform.

"Prepayments" means with respect to a Receivable, all payments, exclusive of Scheduled Payments, paid by or on behalf of the Obligor to prepay, in full or in part, the Unpaid Principal Balance owed by such Obligor under the terms of the related Contract.

"Prime Rate" means, on any day, the highest prime rate of interest for commercial borrowings published from time to time by The Wall Street Journal, provided that if at any time The Wall Street Journal ceases to be published or ceases to publish such prime rate, Agora shall select a nationally recognized substitute publication comparable to The Wall Street Journal for use in determining such prime rate.

"Prior Lender" shall mean, with respect to the acquisition of a Portfolio by Agora, the applicable prior lender of the Originator, if any, identified in the AgoraCapital Platform.

"Purchase" means the purchase of one or more Receivables and Related Security on a Closing Date by Agora  pursuant to the terms of this Agreement and the AgoraCapital Platform.

8

WALT Master Receivables Agreement

"Purchase Documents" means this Agreement the Limited Power of Attorney in the form of Exhibits D hereto, and any other agreement entered into by Originator and Agora in connection with any Purchase.

"Purchase Price" means the aggregate price paid on the related Closing Date for the Receivables purchased by Agora on such Closing Date which shall be satisfied by (a) payment of the Net Advance Remittance, if any, to the Originator or Prior Lender, as applicable, as described in Section 2.2, (b) with respect to the related Portfolio sold on the initial Closing Date, the transfer of the applicable ORI to the Originator and (c) with respect to the related Portfolio sold on any other Closing Date, by the increase in value of the Originator Residual Instrument following the sale and allocation of such Portfolio to the applicable ORI.

"Rebates" means all allocable rebates and refunds of service contracts and warranties and credit life, accident and health insurance and any other similar products, the purchase price of which was included in the Amount Financed of a Receivable, due or collectible upon the prepayment or early termination of such Receivable.

"Receivable" and "Receivables" shall mean the Contract or Contracts, as applicable, subject of this Agreement and identified on the related Receivables Schedule, which Receivable includes without limitation the Receivable File, the Scheduled Payments, Prepayments, Collections, servicing rights and all other rights, benefits, proceeds, and obligations arising from or in connection with such Receivable.

"Receivable File" means the documents as specified on Exhibit B pertaining to any Receivable referred to in the related Receivable Schedule.

"Receivables Schedule" means the schedule of Receivables delivered by the Originator to Agora pursuant to the terms hereof in connection with the sale and purchase of such Receivables on the related Closing Date,, which shall be set forth in the AgoraCapital Platform and populated with the fields set forth in the Electronic Data File.

"Records" means all contracts, purchase orders, invoices and other agreements, documents, books, records related to the Receivables and Related Assets as existing on any media for the storage of information (including tapes, disks, punch cards, computer programs, dealer management systems and databases and related property) maintained by Originator with respect to the Receivables or the related Obligors.

"Recoveries" means, with respect to any Collection Period following the Collection Period in which a Receivable became a Defaulted Receivable, (i) all amounts received by the Servicer from whatever source (including Insurance Proceeds) with respect to such Defaulted Receivable during such Collection Period, minus (ii) the sum of (a) expenses incurred by the Servicer in connection with the collection of such Defaulted Receivable and the repossession and disposition of the related Financed Vehicle (in each case to the extent not previously reimbursed to the Servicer and exclusive of overhead) and (b) all payments required by applicable law to be remitted to the related Obligor.

"Related Assets" means, with respect to any Receivable, all Collections with respect to, and other proceeds of such Receivable, including all funds received by any Person in payment of

9

WALT Master Receivables Agreement

any amounts owed (including finance charges, interest and all other charges, if any) in respect of such Receivable, or otherwise applied to repay or discharge such Receivable (including insurance payments that the Originator would apply in the ordinary course of its business to amounts owed in respect of such Receivable and net proceeds of any sale or other disposition of repossessed goods that were the subject of such Receivable) or other collateral or property of any Obligor or any other Person directly or indirectly liable for payment of such Receivable, and all Records relating to any of the foregoing.

"Related Security" means, with respect to any Receivable:

> (i)  all of Originator's right, title and interest in and to the Financed Vehicles and Related Assets;

> (ii)  all security interests, Liens, real property and/or personal property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Contract related to the Receivable or otherwise, together with all financing statements, security agreements, certificates of title held by the Originator related to the Financed Vehicles or registration applications filed against an Obligor describing any collateral securing such Receivable;

> (iii)  all letters of credit, insurance, guarantees and other agreements or arrangements of whatever character from time to time supporting or securing payment of the Receivable, whether pursuant to the Contract related to the Receivable or otherwise;

> (iv)  the related Contract, all books, Records, accounts and all general intangibles relating to such Receivable and the related Obligor;

> (v)  any proceeds related to a Receivable received by the Originator from any third party that may have originated such Receivable, including proceeds from any Receivable repurchased by a third party pursuant to the related agreement through which Originator acquired such Receivable as a result of a breach of a representation or warranty by such third party;

> (vi)  all documents and information contained in any files maintained by Originator relating to the Contracts, Obligors and/or Financed Vehicles, including any servicing files (both paper and electronic);

> (vii)  any electronic ledger or similar program which tracks the performance of, or which relates to, the Contracts or Financed Vehicles; and

> (viii)  all proceeds derived from any of the foregoing.

"Repurchase Price" has the meaning set forth in Section 6.4 of this Agreement.

"Scheduled Payment" means, with respect to any Collection Period for any Receivable, the amount set forth in such Receivable as required to be paid by the Obligor in such Collection Period. To the extent the Obligor's payment obligation under a Receivable has been modified so as to

10

WALT Master Receivables Agreement

differ from the amount specified in such Receivable (i) as a result of the order of a court in an insolvency proceeding involving the Obligor, (ii) pursuant to the Servicemembers Civil Relief Act or similar legislation or (iii) as a result of modifications or extensions of the Receivable permitted by Section 5.2, then, in each case, the Scheduled Payment shall refer to the Obligor's payment obligation with respect to such Collection Period as so modified.

"Securitization Refinance" shall mean a Receivables financing facility that (i) results in the issuance of one or more classes of bonds and (ii) pursuant to which Agora sells, transfers or contributes, directly or indirectly, Receivables, which are then sold, transferred or contributed to an issuing entity that shall issue such bonds .

"Servicer" shall mean the servicer or servicers appointed to service the assets owned by Agora, initially ADI, or such other entity as appointed by ADI, including any sub-servicers and contractors and third parties as determined by ADI in its sole discretion or pursuant to any Financing.

"Servicing Expense" means, with respect to each Portfolio, the Servicing Fees and any Additional Servicing Compensation in each case, for the applicable Collection Period.

"Servicing Fee Rate" shall have the meaning as set forth in the AgoraCapital Platform provided that upon the occurrence of a Non-Cooperation Event, the Servicing Fee Rate shall mean 5.25 % (or such other rate as is specified in the AgoraCapital Platform) and shall be applied retroactively to the date of this Agreement.

"Servicing Fees" means, with respect to each Portfolio, the monthly fees of the Servicer charged for customer service, collections and remarketing of the Portfolio calculated as the product of (a) the aggregate Unpaid Principal Balance as of the first day of the related Collection Period, (b) the Servicing Fee Rate divided by (c) twelve (12).

"Specified Rate" shall mean, with respect to each Receivable and such Receivable's respective stage such respective rate as set forth in the AgoraCapital Platform; provided however, that upon the occurrence of an Originator Default, the Specified Rate shall mean the highest rate permitted by law for each Receivable and such rate shall remain permanent unless and until the Originator Default shall cease to exist as determined by Agora in its sole discretion.

"Transaction Fees" means the standard and customary fees incurred in connection with the execution, maintenance and closing of each Financing by Agora, including, without limitation, any Underwriting Fees.

"Underwriting Fees" means a fee in the amount of the product of (x) the Underwriting Fee Rate and (y) the Unpaid Principal Balance for all Receivables sold by Originator on and as of a Closing Date. The Underwriting Fee due and payable on the Closing Date for such Receivables shall be non-refundable, due and deemed fully earned by Agora on the Closing Date. At Agora's sole election, the Underwriting Fee may be netted from the Net Advance Remittance.

"Underwriting Fee Rate" shall mean such rate as is specified in the AgoraCapital Platform.

11

WALT Master Receivables Agreement

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of New York or the Uniform Commercial Code as in effect in an otherwise applicable jurisdiction.

"Unpaid Principal Balance" means, with respect to a Receivable, as of a date of determination, the Obligor's original principal balance minus the cumulative principal portion of each installment received prior to such date from the Obligor and applied to reduce such balance, the application of such installment having been determined in accordance with the terms and conditions of the Contract.

**SECTION 1.2    Usage of Terms**.  For purposes of this Agreement, unless otherwise specified herein: (1) accounting terms used and not specifically defined herein shall be construed in accordance with generally accepted accounting principles consistently applied; (2) terms used in Article 9 of the UCC, and not specifically defined herein, are used herein as defined in such Article 9; (3) the term "including" means "including without limitation," and other forms of the verb "to include" have correlative meanings; (4) references to any Person include such Person's permitted successors and assigns; (5) in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (6) the words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement; (7) the term "or" means "and/or"; (8) the meanings of defined terms are equally applicable to the singular and plural forms of such defined terms; (9) references to "Section", "Schedule", "Exhibit", "Annex" and "Appendix" herein are references to Sections, Schedules, Exhibits, Annexes and Appendices in or to this Agreement; (10) the various captions (including any table of contents) are provided solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement; (11) references to any statute or regulation refer to that statute or regulation as amended from time to time, and include any successor statute or regulation of similar import; (12) any reference in this Agreement to this Agreement, or any Purchase Document means such document as amended, restated, supplemented or otherwise modified from time to time; (13) any reference of "Portfolio Administrator" hereunder, including any action or omission of Portfolio Administrator, means Portfolio Administrator acting on behalf of Agora; (14) to the extent required or permitted in the AgoraCapital Policies and Procedures, any information, data, notices and documents (excluding the original Receivable Files) required to be delivered in this Agreement may be delivered utilizing the AgoraCapital Platform.

**SECTION 1.3    Calculations**.  All calculations of the amount of interest accrued on each Receivable will be performed as specified in the related Contract.

**ARTICLE II**
**PURCHASE AND SALE**

**SECTION 2.1    Agreement to Transfer**.  With respect to the acquisition of a Portfolio by Agora, on the related Closing Date, Originator hereby agrees to sell, transfer, assign, set over and otherwise convey to Agora and Agora hereby agrees to purchase and accept assignment and transfer from Originator of all of Originator's right, title and interest in, to and under the Conveyed Property owned by Originator as of the related Cut-Off Date and identified on the related Receivables Schedule.

**SECTION 2.2    Purchase Price**.

12

WALT Master Receivables Agreement

With respect to any Portfolio sold on any Closing Date, the parties agree that the related Purchase Price shall be satisfied by (a) Agora (1) remitting or causing its agent to remit the amount required to be delivered to the applicable Prior Lender(s), if any, as described in the related release substantially in the form of the release attached hereto as Exhibit E and (2) in Agora's sole discretion, either (x) remitting or causing its agent to remit to the Deposit Account or (y) netting or causing its agent to net from any amounts otherwise distributable to Originator the sum of any portion of the related Net Advance Remittance, if any, in excess of the amount required to be delivered to the applicable Prior Lender(s), if any, (b) with respect to the related Portfolio sold on the initial Closing Date, transferring the related ORI to the Originator and the Originator's acceptance thereof and (c) with respect to the related Portfolio sold on any other Closing Date, by the increase in value of the ORI following the sale and allocation of such Portfolio to the applicable ORI.

With respect to the applicable Closing Date, Agora shall own and be entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered) accruing before the related Cut-Off Date if such amounts were not posted to the Receivable prior to the related Cut-Off Date, together with (1) all principal due and owing on the Receivables related to such Portfolio, (2) all Accrued Interest on the Receivables related to such Portfolio; and (3) all other charges or payments due and owing and collections on the Receivables related to such Portfolio, in each case from and after the related Cut-Off Date, a portion of which will be held by Agora for further distribution for the benefit of the Originator in accordance with terms hereof and the documents related to each applicable Financing.

**SECTION 2.3**      **No Assumption of Obligations Relating to Conveyed Property**. Notwithstanding anything to the contrary in this Agreement or in the AgoraCapital Platform, Agora and the Portfolio Administrator each shall have no obligation or liability to (i) any Obligor or (ii) any other customer or client of Originator, including, in each case, any obligation to perform any of the obligations of Originator with respect to any Conveyed Property, whether absolute or contingent or otherwise known or unknown. No such obligation or liability is intended to be assumed by Agora or the Portfolio Administrator and any assumption is expressly disclaimed by Agora and the Portfolio Administrator.

**SECTION 2.4**      **True Sales**.

(a)      It is the express intention of Originator and Agora that the transfer of Conveyed Property on each Closing Date hereunder constitutes a true sale by Originator to Agora that is absolute and irrevocable and that provides Agora with the full benefits of ownership of the Conveyed Property, and not a pledge of such Conveyed Property by Originator to Agora to secure a debt or other obligation of Originator. Consequently, the sale of each Conveyed Property on each Closing Date shall be reflected as a sale on Originator's business records and financial statements. However, in the event that, notwithstanding the intent of the parties, any Conveyed Property is deemed not to have been transferred to Agora, then (i) this Agreement with respect to such Conveyed Property also shall be deemed to be and hereby is a security agreement within the meaning of the UCC, and (ii) the applicable conveyance(s) by Originator of such Conveyed Property provided for in this Agreement shall be deemed to be a grant by Originator to Agora of, and Originator hereby grants to Agora, a security interest in and to all of Originator's right, title and interest in, to and under such Conveyed Property, whether now or hereafter existing or created,

13

WALT Master Receivables Agreement

to secure (1) the rights of Agora and the Portfolio Administrator hereunder, and (2) without limiting the foregoing, the payment and performance of Originator's obligations hereunder and in the AgoraCapital Platform.

(b)    Originator shall, to the extent consistent with this Agreement, take such actions as may be reasonably necessary to ensure that, if this Agreement were deemed to create a security interest in any Conveyed Property, such security interest for such Conveyed Property would be deemed to be a perfected security interest of first priority in favor of Agora under applicable law and will be maintained as such throughout the term of this Agreement.   In connection therewith, Originator hereby authorizes Agora, the Portfolio Administrator and their respective designee(s) to file, at Originator's sole expense, one or more UCC financing or continuation statements, and amendments thereto and assignments thereof, relative to all or any of the applicable Conveyed Property of Originator conveyed to Agora pursuant to this Agreement which was deemed not to have been transferred to Agora as described in Section 2.4(a).

**SECTION 2.5**    <u>Effect of Payment of Purchase Price</u>.  With respect to the acquisition of a Portfolio by Agora on the related Closing Date, upon the payment and conveyance of the related Purchase Price (including the related Originator Residual Instrument) related thereto in the manner described in <u>Section 2.2</u>, title to the Conveyed Property comprising such Portfolio shall vest in Agora, whether or not the conditions precedent to the related Purchase (as set forth in Sections 3.1 and 3.2 hereof) were in fact satisfied; provided, however, Agora and the Portfolio Administrator each shall not be deemed to have waived any claim it may have under this Agreement for the failure by Originator in fact to satisfy any such condition precedent for such Purchase.

With respect to the acquisition of a Portfolio by Agora, upon the consummation of such sale hereunder on the related Closing Date, Agora shall have all of Originator's ownership rights and interests in and to the related Conveyed Property comprising such Portfolio, and Agora shall have all of Originator's rights and interests in and to the Insurance Policies, Financed Vehicles and Certificates of Titles to the Financed Vehicles.  Any expenses incurred in transferring the lien on any electronic Certificates of Title to Agora shall be paid solely by Originator; however, if such expenses are initially paid by Agora or the Portfolio Administrator, Agora and/or the Portfolio Administrator may deduct such expenses from other amounts that may otherwise be payable to Originator (including any distribution under the related Originator Residual Instrument), or Originator shall reimburse Agora for such expenses within ten (10) Business Days after receipt of an invoice.  Originator hereby expressly authorizes the Portfolio Administrator (on behalf of Agora), to effectuate all such transfers.  With respect to the acquisition of a Portfolio by Agora on a Closing Date, Originator will take all actions necessary to ensure that the Servicer obtains the original Contracts, Insurance Policies and Certificates of Title (or state equivalent) to the Financed Vehicles held by any Prior Lender.

At the request of the Portfolio Administrator, Originator will, at Originator's expense, promptly:

(i)    take or cause to be taken any further action necessary or appropriate to effectuate the sale and purchase made hereby and to perfect Agora's security interest in any Contract and/or Financed Vehicle;

14

WALT Master Receivables Agreement

(ii)    execute or cause to be executed such documents and instruments as are necessary or appropriate to effectuate or perfect the sale and purchase made on any Closing Date; and

(iii)    obtain from third parties all documents, instruments, waivers and releases necessary, and to take all other action requested by the Portfolio Administrator, to facilitate the sale and purchase made on any Closing Date.

**SECTION 2.6**        **Servicing of Receivables and Related Security.**  Originator acknowledges and agrees that, consistent with Agora's ownership of any Conveyed Property after the related Closing Date, Agora shall have the sole right to service, administer and collect the Conveyed Property and to assign or delegate such right to others, including without limitation, the Portfolio Administrator and the Servicer. Notwithstanding the foregoing, Originator and Agora agree that Originator shall, if instructed or permitted by Agora, maintain "customer service" communications with each Obligor provided, however, that such communications shall not include any attempt by or on behalf of Originator to collect or make demands of such Obligor with respect to the related Receivable unless expressly permitted by Agora.

**SECTION 2.7**        **AgoraCapital Platform.**  The Originator hereby expressly consents to the use by Agora of the AgoraCapital Platform in order to, among other purposes, reflect specific additional information, terms and conditions regarding this Agreement such as, without limitation, certain prices, rates and identification and classification of Receivables included in sales of Portfolios by Originator to Agora pursuant to and in accordance with the terms hereof.  In addition, Originator agrees (a) to the extent Originator's dealer management system can be integrated with the AgoraCapital Platform, Originator shall effect such integration and (b) otherwise, Originator shall (1) provide Portfolio Administrator a full data file with respect to all of Originator's new originations on a monthly basis and (2) provide Portfolio Administrator with log-in credentials to Originator's dealer management system granting Portfolio Administrator read, download and data extract capabilities. The Originator hereby acknowledges and agrees that, with respect to each Portfolio, certain provisions of this Agreement may be automatically administered and executed using the AgoraCapital Platform, based on the information provided by the Originator and contained in AgoraCapital Platform.  In addition, Originator understand and agrees that in the event of an Originator Default or if Originator uses or attempts to use the AgoraCapital Platform for reasons other than as contemplated herein or as otherwise agreed, Agora reserves the right to limit and restrict Originator's access to the AgoraCapital Platform.  In the event of any such restriction, Agora shall provide Originator written statements and notifications. All other provisions shall be administered and enforced by the Originator, the Portfolio Administrator or Agora in accordance with the AgoraCapital Platform, this Agreement and applicable Law.

**SECTION 2.8**        **Originator Residual Instrument.**  (a) The Originator hereby expressly acknowledges and agrees that any distributions otherwise distributable to Originator under the Originator Residual Instrument, shall be reduced by the related Debt Service, Servicing Expense, Pass Through Fees, Other Billables, and Transaction Fees.  In addition, Originator hereby expressly acknowledges and agrees that if any Originator Default occurs, (i) Agora shall retain and holdback (or cause to be retained and held back ) all distributions otherwise distributable to the Originator Residual Instrument (such holdback the "Originator Default Cash Trap") on and after the occurrence of any Originator Default, (ii) Agora shall deduct any funds in such Originator Default Cash Trap to permit

15

WALT Master Receivables Agreement

Agora to (x) remit amounts owed to any Issuer in connection with any Financing (including in connection with any borrowing base deficiencies and/or margin calls), (y) effect a repurchase on behalf of the Originator pursuant to Section 6.4(a)(i) and/or (z) retain and treat any funds in such Originator Default Cash Trap as indemnity payment(s) made by Originator pursuant to its obligations in Section 7.16 hereof, (iii) such Originator Default Cash Trap will continue until any and all Originator Defaults have been cured as determined by Agora in exercise of its sole discretion, (iv) any remaining funds in the Originator Default Cash Trap following such cure of all Originator Defaults shall be distributable to the Originator Residual Instrument and (v) if a an Originator Default occurs and continues, Agora reserves the right to exercise other remedies including, without limitation, sell Receivables in order to satisfy Originator's obligations hereunder.

(b)     To the extent distributions otherwise due to Originator are less than the aggregate amount of Debt Service, Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and Transaction Fees due from Originator to Agora in any Collection Period, then Originator shall have the right, but not the obligation to take such action, including, without limitation, contribution of additional capital to Agora, in order to permit Agora to perform its obligations under this Agreement.

(c)     Notwithstanding clause (b) above, Originator agrees that it shall have the obligation to pay all Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and Transaction Fees to the extent distributions are insufficient to pay such amounts and that Agora, ADI or any respective Affiliate thereof shall be permitted to deduct from distributions otherwise payable to Originator, hereunder or in any other agreement and also invoice Originator directly, such amounts as are necessary to satisfy any remaining amount of unpaid all Servicing Expense, Pass Through Fees, Underwriting Fees, Other Billables and Transaction Fees. To the extent any deductions are insufficient, Agora shall invoice the Originator for the amounts of any such deficiency.

## ARTICLE III CONDITIONS TO PURCHASE

**SECTION 3.1     Conditions Precedent to Effectiveness of this Agreement.**     The effectiveness of this Agreement is subject to the following conditions precedent that the Portfolio Administrator (on behalf of Agora) shall have received each of the following documents, on or before the initial Closing Date, each in form and substance satisfactory to the Portfolio Administrator (on behalf of Agora) unless waived in the sole discretion of Portfolio Administrator or Agora:

(a)     This Agreement duly executed and delivered by the parties thereto; and

(b)     Any other documents or information reasonably requested by the Portfolio Administrator (on behalf of Agora).

**SECTION 3.2     Conditions Precedent to Purchase.** The acquisition of any Portfolio by Agora on any Closing Date is subject to the satisfaction of the following conditions precedent for each

16

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

Closing Date in form and substance satisfactory to the Portfolio Administrator (on behalf of Agora) unless waived in the sole discretion of Portfolio Administrator or Agora:

(a)     Agora's obligation to remit (or cause to remit) and otherwise convey the related Purchase Price (including the related Originator Residual Instrument) in the manner described in Section 2.2 is subject to and expressly conditioned upon the Portfolio Administrator (on behalf of Agora) having received the following on or before the related Closing Date:

(i)     the related Receivables Schedule (as updated in the AgoraCapital Platform) with respect to the Conveyed Property, delivered pursuant to Section 3.3(a);

(ii)     the AgoraCapital Platform has been updated pursuant to Section 3.3;

(iii)     the amount of powers of attorney in the form of Exhibit D attached hereto, in favor of the Portfolio Administrator or the Servicer or a combination thereof (as directed by the Portfolio Administrator), duly completed, executed, notarized and delivered by Originator to Agora;

(iv)     Fully executed release and guaranty of delivery from any Prior Lender releasing any UCC filings and any and all other liens or encumbrances, pledges or claims against the Contracts, Financed Vehicles and/or Certificates of Title in favor of Prior Lender, and agreeing to send via overnight delivery to the Servicer the original documents, substantially in the form of the release attached hereto as Exhibit E;

(v)     A completed Form W-9 from the Originator and any other documents that may be requested by the Portfolio Administrator (on behalf of Agora);

(vi)     A completed limited personal guaranty in the form of Exhibit I-1 and Exhibit I-2 hereto from each of such principals and officers of the Originator as requested by Agora, and

(vii)     Any other documents, agreements, forms, certificates, data or information as reasonably requested by Agora in its sole discretion.

(b)     All representations and warranties in this Agreement and all other related Purchase Documents are true and correct as of the related Closing Date; and Originator is in compliance with the terms and conditions set forth herein and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement or the AgoraCapital Platform;

(c)     Originator shall have delivered to the Servicer (or to such Person as the Portfolio Administrator directs) the related Receivable File in accordance with Section 3.3;

(d)     To the extent applicable, each secured party (including any party that has a precautionary security interest in a Receivable related to such Portfolio) has released all of its right,

17

WALT Master Receivables Agreement

title and interest in, to and under such Receivable (including, without limitation, any security interest that such secured party or secured party's agent may have by virtue of its possession, custody or control thereof), and to the extent applicable, has filed UCC termination statements in respect of any UCC filings made in respect of such Receivable, and each such release and UCC termination statement or other evidence of release and termination satisfactory to the Portfolio Administrator (on behalf of Agora) has been delivered to the Servicer as part of the Receivable File; and

(e)     Originator shall mark the related portions of its loan servicing system evidencing the related Receivables comprising such Portfolio to be purchased on the related Closing Date or, to the extent the Originator has engaged a third party servicer, Originator shall instruct the Originator's Servicer to mark the related portions of its loan servicing system evidencing the related Receivables comprising such Portfolio to be purchased on the related Closing Date.

**SECTION 3.3**     **Deliverables.**

(a)     With respect to the acquisition of a Portfolio on the related Closing Date by Agora, Originator shall deliver (which such delivery may be effected through the AgoraCapital Platform) the related Receivables Schedule setting forth the related Receivables comprising such Portfolio to be sold on such Closing Date to Agora five (5) Business Days prior to such Closing Date (unless otherwise mutually agreed to by Agora or the Portfolio Administrator and Originator). Originator understands and agrees that Agora intends to and shall rely upon Originator's provision of such information and data, whether created by Originator or not, in loading or boarding the Conveyed Property onto Agora's account servicing system(s).

(b)     The Originator and Agora shall update the AgoraCapital Platform on each Closing Date with respect to the related Conveyed Property.

(c)     With respect to the acquisition of a Portfolio on the related Closing Date by Agora, Originator shall have, prior to the date that is more than ten (10) Business Days prior to such Closing Date deliver and release to the Servicer (or to such Person as Agora or the Portfolio Administrator directs) via overnight delivery the items listed under the related Receivable File with respect to each Receivable sold by Originator to Agora on such Closing Date and set forth on the related Receivables Schedule.  If Agora or the Portfolio Administrator identifies any Receivable that does not conform to the information set forth in the related Receivables Schedule, such Receivable shall be rejected for purchase, unless waived by Agora or the Portfolio Administrator in writing. If not purchased by Agora, such Receivable shall be deleted from the related Receivables Schedule. Agora or the Portfolio Administrator each shall not be required to conduct, or have conducted on its behalf, any such examination.  The fact that Agora, the Portfolio Administrator or their respective designee(s) have conducted or have determined not to conduct any partial or complete examination of the related Receivable Files shall not affect any rights to demand repurchase in accordance with Section 6.4 of this Agreement or any other relief or remedy provided for in this Agreement.

(d)     In the event Originator fails to deliver to the Servicer (or to such Person as Agora or the Portfolio Administrator directs), with respect to any particular Receivable, the related

18

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

Receivable File to the reasonable satisfaction of Agora or the Portfolio Administrator and in accordance with this Section, Agora or the Portfolio Administrator shall provide written notice to Originator of such failure. If, after five (5) Business Days from the date of receipt of such notice, Originator fails to cure such failure, Agora or the Portfolio Administrator may at its sole option require Originator to repurchase such Receivable. If Agora or the Portfolio Administrator requires Originator to repurchase such Receivable, Originator shall repurchase such Conveyed Property by paying to Agora the related Repurchase Price in good funds within two (2) Business Days following Agora's or the Portfolio Administrator's notice hereunder. In the event Originator is required to repurchase the applicable Conveyed Receivable hereunder, Agora or the Portfolio Administrator shall cause the Servicer to deliver to Originator, following Agora's receipt of payment from the Originator of the related Repurchase Price, the related Receivable File and shall cause the assignment to Originator all of Agora's right, title, and interest in and to the related Conveyed Property, free and clear of any and all claims, liens, and encumbrances, except for those which existed at the time of Agora's purchase thereof from Originator.

(e)     Forwarding of Notices. Originator shall deliver, via electronic mail or via the AgoraCapital Platform's messaging function, to the Portfolio Administrator and Agora immediately upon receipt (and in no event later than two (2) business days) any notices received by Originator regarding any Receivables identified on any Receivable Schedule. Such notices shall include but not be limited to; impound notices, seizure notices, mechanic liens, bankruptcy filings and any other notices affecting the Receivables or Financed Vehicles identified on the related Receivable Schedule. The Originator acknowledges and agrees that for purposes of satisfying Originator's obligations under this Section 3.3(e), that any such notice shall not be deemed delivered to Agora or the Portfolio Administrator unless and until Agora or the Portfolio Administrator has provided confirmation of receipt of such notice. The Originator shall bear the burden of proof of demonstrating that Originator has satisfied its obligations of delivery per the standards set forth in this Section 3.3(e).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

**SECTION 4.1     Representations and Warranties of Originator**. Originator represents and warrants to Agora and the Portfolio Administrator as of each Closing Date:

(a)     Corporate Existence and Power. Originator is an entity duly organized, validly existing and in good standing under the Laws of its state of organization and has all corporate power and authority and all governmental licenses, authorizations, consents and approvals required to carry on its business in each jurisdiction in which its business is now conducted. No licenses or approvals obtained by Originator have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation.

(b)     Corporate Authorization. Originator has the requisite corporate power and authority to hold and sell each Receivable, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement and all other Purchase Documents to which it is a party. Originator has duly authorized the execution, delivery and performance of this Agreement and all other Purchase Documents to which it is a party and has

19

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

duly executed and delivered this Agreement and all other Purchase Documents to which it is a party. This Agreement and all other Purchase Documents to which Originator is a party constitute legal, valid and binding obligations of Originator, enforceable against it in accordance with their terms, except as enforcement of such terms may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(c)     No Contravention.  The execution and delivery of the Purchase Documents to which it is a party by Originator and its performance of and compliance with the terms of such Purchase Documents will not (i) contravene any applicable Law, rule or regulation, (ii) contravene or constitute a default under its charter or by-laws or other constitutive documents, (iii) contravene or constitute a default under any agreement, order or other instrument to which it is a party or to which any part of its property is subject, or (iv) result in any Adverse Claim on any Receivable or Collections.

(d)     Litigation and Other Proceedings.  There is no pending or threatened action, suit or proceeding against Originator which would prevent or impede it from entering into or fully performing its obligations under this Agreement.  There is no suit before or by any Governmental Authority or arbitrator pending, no action, investigation, or proceeding before or by any Governmental Authority or arbitrator pending or threatened against or affecting Originator, that would, if adversely determined, have a Material Adverse Effect on the business, condition (financial or otherwise), operations, prospects, or properties of Originator, including, but not limited to, the Receivables.  During the past three (3) years prior to the related Closing Date there have been no regulatory actions, civil investigative demands, or any actions or investigations by a state Attorney General, the Department of Justice or any other state or federal regulator other than what has been disclosed to Agora and the Portfolio Administrator in writing and/or which is identified on the AgoraCapital Platform.  There are no outstanding judgments against Originator.  Originator agrees to immediately notify Agora and the Portfolio Administrator of any material litigation or any investigation that could lead to material litigation.

(e)     Approvals.  All authorizations, consents, filings, orders and approvals of, or other action by, any Governmental Authority or other Person that are required to be obtained by Originator, and all notices to and with any Governmental Authority or other Person that are required to be made by it, in the case of each of the foregoing in connection with the transfer of related Receivables and Related Security or the due execution, delivery and performance by Originator of this Agreement and all other Purchase Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been obtained or made and are in full force and effect.

(f)     Bulk Sales Act.  The consummation of the transactions contemplated by the Purchase Documents are in the ordinary course of business of Originator and no transaction contemplated by the Purchase Documents requires compliance with, or will be subject to avoidance under, any bulk sales act or similar law.

(g)     Disclosure.  All information heretofore or hereafter furnished to Agora and/or the Portfolio Administrator with respect to the Receivables, Obligors, Certificates of Title and/or Financed Vehicles was true and complete in all material respects at the time it was disclosed

20

WALT Master Receivables Agreement

and will continue to be so at all times following the execution of this Agreement. The representations and warranties made by Originator herein and any certificates, exhibits and schedules attached hereto (including any such documents furnished by electronic medium) furnished to Agora and/or the Portfolio Administrator by Originator, are true, complete and accurate.

(h)     Offices.  The principal place of business of Originator is located at the address set forth in the preamble hereto, and Originator has been located at such address since at least six (6) months prior to the related Closing Date unless Originator has expressly notified Agora and the Portfolio Administrator in writing before the date hereof.

(i)     Investment Company Act.  Originator is not an "investment company", or controlled by an "investment company", registered or required to be registered under the Investment Company Act of 1940, as amended.

(j)     Taxes.  Originator has filed or caused to be filed all tax returns and reports required by law to have been filed by it and has paid all taxes, assessments and governmental charges thereby shown to be due on such returns, except any such taxes, assessments or charges (i) that are being diligently contested in good faith by appropriate proceedings and (ii) with respect to which no Adverse Claim has been imposed upon any Receivables.

(k)     Brokers; Kickbacks.  There are no broker's or finder's fees payable to any Person in connection with this Agreement or the transactions contemplated herein.  Neither Originator nor any of its Affiliates, officers, employees or agents has paid or received, or made or received an offer to pay any kickback or bribe with respect to the transactions contemplated in this Agreement, or with respect to the Receivables, including, without limitation, the servicing or origination thereof.

(l)     Solvency.  As of the date of this Agreement, and after giving effect to the transactions contemplated by this Agreement, Originator will not (1) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liabilities on its existing debts as they mature); (2) have unreasonably small capital with which to engage in its business; or (3) have incurred debts beyond its ability to pay as they become due.

(m)     AgoraCapital Participant.  The Originator is an AgoraCapital Participant in good standing.

(n)     If it has not already done so as of the date of this Agreement, Originator will provide the Portfolio Administrator with Originator's logo within three (3) Business Days prior to the Closing Date so that the Portfolio Administrator or the Servicer may, at their sole discretion, send to the Obligors identified on the related Receivable Schedule a "Goodbye" letter.  Such "Goodbye" letter shall be in substantially similar form as that attached hereto as Exhibit C. Originator hereby grants the Portfolio Administrator and the Servicer permission to execute such letter on behalf of Originator and to distribute same to all applicable Obligors.  In addition, Originator shall provide additional assistance as reasonably requested by Agora, the Portfolio

21

WALT Master Receivables Agreement

Administrator or the Servicer to facilitate the transfer of the Receivables, including, without limitation, calling related Obligors to inform Obligors of the transfer of servicing.

(o)     Each of the individuals listed on Exhibit G hereto as an Authorized Originator Representative is duly authorized to receive and deliver information, notices and instructions on behalf of Originator, either verbally or in writing (including electronic communications), and sign documents related to this Agreement and such individuals have the actual authority to otherwise bind and obligate the Originator. Agora and Portfolio Administer are entitled to rely upon any notices and instructions without further inquiry or confirmation.

**SECTION 4.2       Representations and Warranties of Originator With Respect to Each Receivable**.  With respect to each Receivable, Originator represents and warrants to Agora and the Portfolio Administrator as of the related Closing Date:

(a)     Characteristics of Receivables.  Each Receivable (A) was originated by an Originator or an Affiliate of Originator or was originated by a third party and purchased by Originator, in each case in accordance with Originator's credit policies as of the date of origination or acquisition and in the ordinary course of Originator's business and, as applicable, was validly assigned, (B) was originated for the retail sale of a Financed Vehicle in the ordinary course of the Originator's business, or the thirty party's ordinary course of business, as applicable, and was fully and properly executed by the parties thereto, and the Originator or third party, as applicable, had all necessary licenses and permits to originate Receivables in the State where such Originator was located, (C) contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for realization against the collateral security, and (D) is a Receivable which provides for level monthly payments (provided that the period in the first period and the payment in the final period of the Receivable may be minimally different from the normal period and level payment) which, if made when due, shall fully amortize the Amount Financed over the original term.

(b)     Compliance with Law.  All requirements of applicable federal, state and local Laws, and regulations thereunder (including usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Moss-Magnuson Warranty Act, the Consumer Financial Protection Bureau's Regulations "B" and "Z" (including amendments to the Federal Reserve's Official Staff Commentary to Regulation Z, effective October 1, 1998, concerning negative equity loans), the Servicemembers Civil Relief Act, each applicable State Motor Vehicle Retail Installment Sales Act, and State adaptations of the National Consumer Act and of the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity and disclosure laws) in respect of the Receivables and the Financed Vehicles and any related service contract, have been complied with in all material respects, and each Receivable and the sale of the Financed Vehicle and any related service contract evidenced by each Receivable complied at the time it was originated or made and now complies in all material respects with all applicable legal requirements.

(c)     Origination.  Each Receivable was originated in the United States.

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

(d)     <u>Binding Obligation</u>.  Each Receivable represents the genuine, legal, valid and binding payment obligation of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except (A) as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law and (B) as such Receivable may be modified by the application after the Cut-Off Date of the Servicemembers Civil Relief Act, the California Military Families Financial Relief Act or similar legislation; and all parties to each Receivable had full legal capacity to execute and deliver such Receivable and all other documents related thereto and to grant the security interest purported to be granted thereby.

(e)     <u>No Government Obligor</u>.  No Obligor is the United States or any State or any agency, department, subdivision or instrumentality of the United States or of any State.

(f)     <u>Obligor Bankruptcy</u>.  At the Cut-Off Date no Obligor had been identified on the records of the Servicer as being the subject of a current bankruptcy proceeding.

(g)     <u>Schedule of Receivables</u>.  The information set forth in the Receivables Schedule and was true and correct in all material respects as of the close of business on the Cut-Off Date.

(h)     <u>Data File</u>.  The data file made available by the Originator to Agora and the Portfolio Administrator on the Closing Date was complete and accurate as of the Cut-Off Date and includes a description of the same Receivables that are described in the Receivables Schedule.

(i)     <u>Chattel Paper</u>.  The Receivables constitute either "tangible chattel paper" or "electronic chattel paper" within the meaning of the UCC as in effect in the related states where such Receivables were originated.

(j)     <u>One Original</u>.  There is only one original executed copy (or with respect to Electronic Contracts, one Authoritative Copy) of each Contract and there has not ever been any other original or Authoritative Copy of such Receivable.

(k)     <u>Receivable Files Complete</u>.  There exists a Receivable File pertaining to each Receivable and such Receivable File contains a fully executed original of the Contract, the Certificate of Title or a copy of the application or receipt therefor, or other evidence of title showing Originator as secured party.  Related documentation concerning the Receivable, including any documentation regarding modifications of the Contract, will be maintained electronically by the Servicer in accordance with customary policies and procedures.  Each of such documents which is required to be signed by the Obligor has been signed by the Obligor in the appropriate spaces.  All blanks on any form have been properly filled in and each form has otherwise been correctly prepared.  The Custodian or Servicer will maintain the complete Receivable File for each Receivable, including with respect to each Receivable evidence by a Contract that constitutes "tangible chattel paper", a fully executed original of such Contract at one of its offices or the offices of one of its agents or sub-custodians within the United States.

(l)     <u>Receivables in Force</u>.  No Receivable has been satisfied, subordinated or rescinded, and the Financed Vehicle securing each such Receivable has not been released from the

23

WALT Master Receivables Agreement

lien of the related Receivable in whole or in part.  No terms of any Receivable have been waived, altered or modified in any respect since its origination, except by instruments or documents readily identifiable in the Receivable File or the Servicer's electronic records.

(m)  <u>Lawful Assignment</u>.  No Receivable was originated in, or is subject to the Laws of, any jurisdiction the Laws of which would make unlawful, void or voidable the sale, transfer and assignment of such Receivable or any portion thereof under this Agreement.

(n)  <u>Good Title</u>.  Immediately prior to the conveyance of the Receivables to Agora on the applicable Closing Date, the Originator was the sole owner thereof and had good and indefeasible title thereto, free of any Lien and, upon execution and delivery of this Agreement and the updating of the AgoraCapital Platform, Agora shall have good and indefeasible title to and will be the sole owner of such Receivables, free of any Lien.  No Originator has a participation in, or other right to receive, proceeds of any Receivable.  No Originator has taken any action to convey any right to any Person that would result in such Person having a right to payments received under the related Insurance Policies or to payments due under such Receivables.

(o)  <u>Security Interest in Financed Vehicle</u>.  Each Receivable created or shall create a valid, binding and enforceable first priority security interest in favor of the Originator in the Financed Vehicle.  The Certificate of Title for each Financed Vehicle shows, or if a new or replacement Certificate of Title is being applied for with respect to such Financed Vehicle the Certificate of Title will be received within 90 days of the origination of the related Receivable and will show, the Originator, or if directed by Agora, such other entity as so specified by Agora in its sole discretion  named as the original secured party under each Receivable as the holder of a first priority security interest in such Financed Vehicle.  With respect to each Receivable for which the Certificate of Title has not yet been returned from the Registrar of Titles, Originator has applied for or received written or electronic evidence that such Certificate of Title showing Originator as first lienholder has been applied for and Originator's security interest (assigned by Originator to Agora) has been validly assigned by the Originator to Agora and reflected on the AgoraCapital Platform and immediately upon the transfer and assignment of the Receivables to Agora on the Closing Date, Agora shall have good and marketable title to the Receivables and, free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest or other right or title of any other Person.  As of the Cut-Off Date, there were no Liens or claims for taxes, work, labor or materials affecting a Financed Vehicle which are or may be Liens prior or equal to the Liens of the related Receivable.

(p)  <u>All Filings Made</u>.  All filings (including the filings of all appropriate financing statements in the proper filing office in the State of Delaware under applicable law in order to perfect the security interest in the Receivables granted pursuant to the related Financing) required to be made by any Person and actions required to be taken or performed by any Person in any jurisdiction to perfect the lien on, or ownership interest in, the Receivables and the proceeds thereof and the Conveyed Property have been made, taken or performed.

(q)  <u>Receivable Not Assumable</u>.  No Receivable is assumable by another Person in a manner which would release the Obligor thereof from such Obligor's obligations to the holder thereof with respect to such Receivable.

24

WALT Master Receivables Agreement

(r)     No Defenses.  No Receivable is subject to any right of rescission, setoff, counterclaim or defense and no such right has been asserted or threatened with respect to any Receivable.  The operation of the terms of any Receivable or the exercise of any right thereunder will not render such Receivable unenforceable in whole or in part or subject to any right of rescission, set-off, counterclaim or defense.

(s)     No Default.  There has been no default, breach, violation or event permitting acceleration under the terms of any Receivable (other than payment delinquencies of not more than 30 days), and no condition exists, or event has occurred and is continuing that with notice, the lapse of time or both would constitute a default, breach, violation or event permitting acceleration under the terms of any Receivable, and there has been no waiver of any of the foregoing.  As of the Cut-Off Date, no Financed Vehicle had been repossessed.

(t)     Insurance.  At the time of an origination or acquisition of a Receivable by an Originator, each Financed Vehicle is required to be covered by a comprehensive and collision insurance policy (A) in an amount at least equal to the lesser of (i) its maximum insurable value or (ii) the principal amount due from the Obligor under the related Receivable, (B) naming Originator (or if such Receivable was originated by a third party, such third party) as loss payee and (C) insuring against loss and damage due to fire, theft, transportation, collision and other risks generally covered by comprehensive and collision coverage.  Each Receivable requires the Obligor to maintain physical loss and damage insurance, naming Originator and its successors and assigns as additional insured parties, and each Receivable permits the holder thereof to obtain physical loss and damage insurance at the expense of the Obligor if the Obligor fails to do so.  No Financed Vehicle is insured under a policy of force-placed insurance on the Cut-Off Date.

(u)     Certain Characteristics of the Receivables.

a.     Each Obligor had a billing address in the United States as of the date of origination of the related Receivable, is a natural person and is not an Affiliate of any party to the Transaction Documents.

b.     Each Receivable is denominated in, and each Contract provides for payment in, United States dollars.

c.     Each Receivable arose under a Contract that is assignable without the consent of, or notice to, the Obligor thereunder, and does not contain a confidentiality provision that purports to restrict the ability of Agora or the Portfolio Administrator to exercise its rights under this Agreement, including its right to review the Contract.

d.     No Financed Vehicle was subject to force-placed insurance.

e.     No Obligor has any option under a Receivable to borrow from any Person additional funds secured by the related Financed Vehicle.

(v)     Lien Enforcement.  Each Receivable provides for enforcement of the lien or the clear legal right of repossession, as applicable, on the Financed Vehicle securing such Receivable.

25

WALT Master Receivables Agreement

(w)     <u>Risk of Loss</u>.  Each Contract contains provisions requiring the Obligor to assume all risk of loss or malfunction on the related Financed Vehicle, requiring the Obligor to pay all sales, use, property, excise and other similar taxes imposed on or with respect to the Financed Vehicle and making the Obligor liable for all payments required to be made thereunder, without any setoff, counterclaim or defense for any reason whatsoever, subject only to the Obligor's right of quiet enjoyment.

(x)     <u>Leasing Business</u>.  No Obligor is a Person involved in the business of leasing or selling equipment of a type similar to the Obligor's related Financed Vehicle.

(y)     <u>Consumer Leases</u>.  No Receivable constitutes a "consumer lease" under either (A) the UCC as in effect in the jurisdiction the law of which governs the Receivable or (B) the Consumer Leasing Act, 15 USC 1667.

(z)     <u>Perfection</u>.  Originator has taken all steps necessary to perfect its security interest against the related Obligors in the property securing the Receivables and will take all necessary steps on behalf of Agora to maintain Agora's perfection of the security interest created by each Receivable in the related Financed Vehicle.

(aa)     <u>No Fleet Sales</u>.  None of the Receivables have been included in a "fleet" sale (i.e., a sale to any single Obligor of more than seven Financed Vehicles).

(bb)     <u>No Outstanding Obligations.</u> There exist no obligations (financial or otherwise) due from the Originator to the related Obligor or from the related Obligor to the Originator (e.g., deferred down payment) related to the origination of such Receivable.

(cc)     <u>Portfolio Eligibility Criteria</u>.  The Receivables in the related Portfolio satisfy the Portfolio Eligibility Criteria.

The representations, warranties and covenants contained in this Article IV shall survive the related Closing Date and any termination of this Agreement.

## ARTICLE V
## GENERAL COVENANTS OF ORIGINATOR

**SECTION 5.1**     <u>**Affirmative Covenants**</u>.  From the date of this Agreement until the first day following the date on which all Receivables purchased hereunder have been indefeasibly paid in full to Agora, Originator agrees that it will perform the covenants and agreements set forth in this Section.

(a)     <u>Location</u>.  Originator shall give Agora and the Portfolio Administrator prompt written notice of any relocation of its principal executive office from the address set forth in the preamble hereto or change of its entity structure, corporate form, or jurisdiction of organization.

(b)     <u>Taxes</u>.  Originator shall file or cause to be filed all federal, state and local tax returns that are required to be filed by it and pay or cause to be paid all taxes shown to be due

26

WALT Master Receivables Agreement

and payable on taxes or assessments (except only such taxes or assessments the validity of which are being contested in good faith by appropriate proceedings).

(c)     Delivery of Collections.  To the extent Originator or Originator's Servicer receives any Collections in respect of any Conveyed Property after the related Closing Date, Originator shall deliver, and shall direct Originator's Servicer to deliver, as appropriate, directly to such account or otherwise as Agora or the Portfolio Administrator may designate, within two (2) Business Days after receipt and identification thereof, any and all such Collections in the form so received, and agrees that all such Collections shall be deemed to be received in trust for Agora and shall be held in trust until such Collections are delivered to the Servicer; provided further Originator or Originator's Servicer shall not comingle such funds prior to delivery to the Servicer hereunder.  In addition, Originator hereby expressly consents and permits Agora collect any such amounts owed under this Section 5.1(c) by debiting Originator's bank account via an ACH transaction and Originator has provided the authorization for such direct ACH debit in the form of Exhibit F hereto.

(d)     Further Action Evidencing Purchases.  Originator agrees that from time to time, at Originator's expense, it will promptly, upon request by Agora or the Portfolio Administrator, execute and deliver all further instruments and documents, and take all further action, in order to perfect, protect or more fully evidence the purchase of any Conveyed Property hereunder by Agora.  Without limiting the generality of the foregoing, Originator will:

(i)     treat all Purchases hereunder as a sale on the books and records of Originator for accounting purposes and will maintain a complete set of books and records which shall be clearly marked to reflect the ownership of each Receivable by Agora;

(ii)     maintain or request Originator's Servicer to maintain its loan servicing system, in accordance with the Policies and Procedures, so that, from the time of conveyance hereunder of the related Receivables to Agora, Originator's or Originator's Servicer's loan servicing system (including any back up archives) that refer to such Receivable will clearly indicate the ownership of such Receivable by Agora.  Indication of Agora's (or its assignee's) ownership of a Receivable will be deleted from or modified on Originator's or Originator's Servicer's loan servicing system when, and only when, the Receivable has been paid in full or repurchased by Originator;

(iii)     upon Agora's or the Portfolio Administrator's request, at Originator's sole expense, file such UCC financing or continuation statements, or amendments thereto or assignments thereof, and such other instruments or notices, as Agora or the Portfolio Administrator may determine to be necessary or appropriate to maintain the perfection of its security interest in the related Receivables and Related Security and Agora's security interest in the Conveyed Property; and,

(iv)     upon Agora's or the Portfolio Administrator's request, notify the Obligors of Agora's ownership and servicing of the Receivables and related

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

Contracts by (A) the mailing of a letter, in the form attached as Exhibit C hereto, within two (2) Business Days of the related Closing Date, and (B) during any in-person, telephonic, electronic, or other interactions with Obligors. Agora and the Portfolio Administrator are permitted to use Originator's logo and send letter on Originator's behalf with the return address being that of the Portfolio Administrator or as specified by the Portfolio Administrator.

(e)     Notices.   Immediately upon becoming aware of any of the following, Originator shall notify Agora and the Portfolio Administrator and provide a description of:

(i)     the failure of any material representation or warranty herein to be true in any material respect;

(ii)     the institution of any litigation, arbitration proceeding or governmental proceeding reasonably likely to have a Material Adverse Effect;

(iii)     any changes, revisions and/or modifications to the Policies and Procedures since the last version was provided by the Originator to Agora and the Portfolio Administrator; or

(iv)     the entry of any judgment or decree against Originator, its parent or any subsidiary if the aggregate amount of all judgments then outstanding against Originator or its parent and any Subsidiaries exceeds one hundred thousand dollars ($100,000).

**SECTION 5.2**     **Negative Covenants**.  From the date of this Agreement until the first day following the date on which all Receivables purchased hereunder have been indefeasibly paid in full to Agora, Originator hereby agrees that it shall not do any of the following:

(a)     (A) Sell, assign (by operation of law or otherwise) or otherwise transfer to any Person, (B) pledge any interest in, (C) grant, create, incur, assume or permit to exist any Adverse Claim to or in favor of any Person upon or with respect to, or (D) cause to be filed any UCC financing statement or equivalent document relating to perfection, in each case, with respect to any Conveyed Property;

(b)     Assign to any Person any right to receive income from or in respect of any Conveyed Property;

(c)     Extend, amend, waive or otherwise modify the terms of any Conveyed Property;

(d)     Fail to provide Agora or the Portfolio Administrator prompt written notice of its change in name in any manner;

(e)     In the fulfillment of Originator's obligations under this Agreement, engage in, or allow or permit any Person under its direct control or direction to engage in, any fraudulent activity or other activity which would constitute a violation of a Law;

28

WALT Master Receivables Agreement

(f)     Solicit, encourage, or otherwise suggest an Obligor in any manner breach any term of the Contract related to a Receivable;

(g)     Without the express prior consent of Agora, contact any or communicate with any Obligor regarding such Obligor's obligations under a Receivable, including, without limitation, communicate with or threaten any Obligor into believing the Financed Vehicle can be repossessed as relates to any collateral protection insurance obligations of such Obligor,

(h)     Establish or maintain any line of credit, sell receivables or establish any other similar relationship with Prior Lender or any other lender or prospective purchaser or other financing entity with respect to financing or purchase of receivables without Portfolio Administrator's (at Agora's direction) or Agora's express prior written consent, or

(i)     Accept or receive or agree to accept or receive any rebate, refund, commission, fee, kickback or rakeoff, whether cash or otherwise and whether paid by or originating with an Obligor or any other Person (including, but not limited to, brokers and agents), as a result of or in any way related to any Receivable or in connection with the sale, disposition, transfer or servicing of any Receivable.

(j)     Permit a change in the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the Originator, whether through the ability to exercise voting power, by contract or otherwise.

(k)     Engage in any business different from the business conducted by Originator on the date hereof.

## ARTICLE VI
## ADDITIONAL RIGHTS AND OBLIGATIONS IN
## RESPECT OF THE CONVEYED PROPERTY

**SECTION 6.1**      **Rights and Obligations of Agora**.

(a)     Agora and the Portfolio Administrator shall, in each case, have no obligation to account for any Conveyed Property to Originator.  Agora and the Portfolio Administrator shall, in each case, have no obligation to account for, or to return Collections, or any interest or other finance charge collected pursuant thereto, to Originator, irrespective of whether such Collections and charges are in excess of the Purchase Price for the Conveyed Property.

(b)     Agora shall have the unrestricted right to further assign, transfer, deliver, hypothecate, subdivide or otherwise deal with the Conveyed Property, and all of Agora's right, title and interest in, to and under this Agreement, on whatever terms the Portfolio Administrator (as the direction of Agora) shall determine.

**SECTION 6.2**      **Contribution to Special Purpose Entity**.  At any time, and from time to time, at the request of Agora, in Agora's sole discretion and at Originator's sole cost and expense (including all reasonable legal fees and costs associated with establishing the applicable entity and transferring the receivables) Originator agrees that it shall use its best efforts to deliver such consents,

29

WALT Master Receivables Agreement

amendments, documents and legal opinions and undertake such other actions in connection with the exercise by Agora of its rights described in Section 6.1(b) described above, in each case, as required by Agora in its reasonable discretion to effectuate a Financing. Originator's failure to perform its obligations under this Section 6.2 shall, in Agora's sole discretion, result in a Non-Cooperation Event.

**SECTION 6.3**    **Mandatory Delivery**. The sale and delivery of each Conveyed Property on or before the related Closing Date is mandatory from and after the date of the delivery of the final related Receivables Schedule, it being specifically understood and agreed that each Receivable is unique and identifiable on the date thereof and that an award of money damages would be insufficient to compensate Agora for the losses and damages incurred by Agora (including damages to the related Issuer and/or prospective purchasers of the Receivables) in the event of Originator's failure to deliver each of the related Conveyed Property on or before the related Closing Date. Originator hereby agrees that it holds such Receivable in custody for Agora subject to (a) the Portfolio Administrator's (at Agora's direction) right to reject any Receivable under the terms of this Agreement, and (b) the obligation to pay and otherwise convey the related Purchase Price in the manner described in <u>Section 2.2</u>. All rights and remedies of Agora and the Portfolio Administrator under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

**SECTION 6.4**    **Repurchase of Receivables**.

(a)    The representations, warranties, covenants, and promises of Originator set forth herein shall survive the sale of Receivables to Agora and shall inure to the benefit of Agora and the Portfolio Administrator and their respective successors and assigns, notwithstanding any restrictive or qualified endorsement on any Contract.

(i)    In the event of a breach by Originator or its agents of any representation, warranty, covenant, or promise in this Agreement with respect to any Receivable, the party discovering such breach will provide written notice to the other party (including written notice to Agora and the Portfolio Administrator to the extent the Originator is the discovering party); <u>provided</u>, <u>however</u>, that in determining whether there has been a breach and the damages resulting from such breach, (A) any limitation or qualification as to "material", "Material Adverse Change" or similar qualifications contained in such representations and warranties shall be disregarded and (B) any limitation or qualification of the representations and warranties set forth in by references to the Originator's knowledge or to the best of the Originator's knowledge shall be disregarded. If such breach is not cured by the Originator to the reasonable satisfaction of Agora within thirty (30) calendar days of the earlier of (i) notice to Originator or (ii) discovery by Originator of such breach, Originator shall repurchase such Receivable and the Related Security by paying Agora the Repurchase Price in good funds within three (3) Business Days after expiration of such thirty (30) calendar days cure period. In addition, to the extent Originator does not repurchase any Receivable as required, Agora shall have the right, in its sole discretion, to (A) net the Repurchase Price from amounts otherwise distributable to Originator, (B) invoice and deduct payment in the amount of any such Repurchase Price and (C) debit Originator's bank account in the amount

30

WALT Master Receivables Agreement

of the Repurchase Price via an ACH transaction and Originator has provided the authorization for such direct ACH debit in the form of Exhibit F hereto. Agora shall charge Originator and Originator agrees to pay, any fees related to any bounced ACH transactions hereunder. In the event Originator is required to repurchase a Receivable, the Portfolio Administrator shall cause the delivery to Originator the related Receivable File and shall cause Agora to assign to Originator all of Agora's right, title, and interest in and to the related Conveyed Property, free and clear of any and all claims, liens, and encumbrances, except for those which existed at the time of Agora's purchase thereof from Originator.  The Portfolio Administrator shall cause such delivery and assignment within a reasonable period of time following Agora's receipt in full of the Repurchase Price from Originator.

(ii)      In addition to, and not in limitation of the foregoing or any other rights that Agora may have under this Agreement, including, but not limited to, Agora's (or the Portfolio Administrator's) rights to specifically enforce this Agreement in accordance with <u>Section 7.7</u>, the parties agree that, in the event that (A) Agora shall have repossessed or otherwise obtained possession of a Financed Vehicle that is the subject of the Receivable to which a breach of a representation or warranty relates, and (B) Originator shall not have reimbursed Agora in full within three (3) business days of notification of said breach, as provided above, the Portfolio Administrator (at Agora's direction) shall have the right, without further notice to Originator, to mitigate its damages due to Originator's failure to perform by taking any commercially reasonable actions, including, but not limited to, causing the sale or disposal of the subject Financed Vehicle in a commercially reasonable manner.  Any proceeds from such sale or disposal shall be applied by the Portfolio Administrator to offset any amounts due to Agora from Originator had Originator complied with the terms of this <u>Section 6.4</u>.  The provisions of this <u>Section 6.4</u> are in addition to, and not in lieu of, the provisions of <u>Section 7.16</u> of this Agreement.

(b)      In the event any Obligor payment posted by Originator prior to the related Cut-Off Date is returned for insufficient funds or similar reasons (either to Originator prior to the related Cut-Off Date and not posted to such Obligor's account prior to the related Cut-Off Date or to Agora) and the effect of such returned payment results in the applicable Receivable becoming thirty (30) days or greater delinquent, such Receivable will be repurchased by Originator pursuant to <u>Section 6.4</u> of this Agreement (it being deemed any cure periods set forth therein shall be deemed expired).  Further, in the event that (i) any Financed Vehicle has been involved in an accident and deemed a total loss, or is impaired with the cost of repairs exceeding $999.99 prior to the related Cut-Off Date; (ii) any Obligor requests a voluntary repossession prior to the related Cut-Off Date; (iii) the Originator takes possession of the related Finance Vehicle or (iv) Originator, or any entity related to Originator sells, leases or finances or facilitates any sale, lease or financings of any vehicle to an Obligor before the related Receivable purchased hereunder has been satisfied and paid in full, and prior to such new sale, lease or financing of such vehicle Originator does not satisfy and pay in full or cause the related Obligor to satisfy or pay in full the Receivable purchased under this Agreement, then in the event of any of (i), (ii), (iii) or (iv) above, such Receivable shall be repurchased by Originator pursuant to <u>Section 6.4</u> of this Agreement (it being deemed any cure periods set forth therein shall be deemed expired).

31

WALT Master Receivables Agreement

(c)    **ORIGINATOR IS STRICTLY PROHIBITED FROM TAKING ANY ACTION OR COMMUNICATING WITH AN OBLIGOR UNTIL THE APPLICABLE STEPS RELATING TO REPURCHASE DESCRIBED IN THIS SECTION 6.4(a) HAVE BEEN COMPLETED AND AGORA HAS REASSIGNED TO ORIGINATOR THE VEHICLE TITLE AND RECEIVABLE.  THIS INCLUDES, BUT IS NOT LIMITED TO, REPOSSESSION OF THE VEHICLE OR COLLECTION EFFORTS BY ORIGINATOR WITH THE OBLIGOR.**

(d)    The "Repurchase Price" of a Receivable shall be the Payoff  of such Receivable.

**SECTION 6.5        Power of Attorney**.  Originator hereby authorizes Agora, the Portfolio Administrator and/or their respective designees to take any and all steps in Originator's name and on behalf of Originator that Agora, the Portfolio Administrator and/or their respective designees determines are reasonably necessary or appropriate to collect all amounts due under any and all Conveyed Property, including endorsing the name of Originator on checks and other instruments representing Collections and enforcing Originator's rights under such Conveyed Property.  Originator hereby grants Agora and the Portfolio Administrator an irrevocable power of attorney with full power of substitution, coupled with an interest to take in the name of Originator all steps necessary or advisable to endorse, negotiate or otherwise realize on any writing or other right of any kind held or transmitted by Originator or transmitted or received by Agora (whether or not from Originator) in connection with any Conveyed Property.

**SECTION 6.6        Assignment of Contract Rights between Originator and Third Parties**.

(a)    With respect to the acquisition of a Portfolio on the related Closing Date by Agora, on such Closing Date Originator hereby assigns, transfers and sets over to Agora, and grants to Agora a lien on and security interest in, all of Originator's rights, but not Originator's obligations, under any of the agreements with third party originators related to such Conveyed Property that comprises any portion of such Portfolio (each an "Assigned Agreement") sold on such Closing Date.  For the avoidance of doubt, Agora and the Portfolio Administrator each shall have no obligation or duty to perform any of the obligations of Originator under any of the Assigned Agreements.

(b)    With respect to the acquisition of a Portfolio on the related Closing Date by Agora, the rights assigned hereunder related to such Portfolio include, but are not limited to, any and all rights and rights of enforcement regarding warranties, representations, covenants and indemnities made by Originator or the applicable Originator under an Assigned Agreement including, but not limited to, all rights granted to Originator pursuant to any exhibits and schedules to the foregoing, and all rights, claims or causes of action against an Originator for any breach or violation by such Originator of the provisions of the related Assigned Agreement.  Agora and the Portfolio Administrator shall have the exclusive right to institute action and seek redress directly against an Originator under the related Assigned Agreement for any such breach or violation.

(c)    Originators are hereby authorized to recognize the Portfolio Administrator's claims and rights hereunder without investigation of the validity or the amount of the obligations under this Agreement or the existence of any default(s) hereunder.

32

WALT Master Receivables Agreement

**SECTION 6.7**     **Devices**.  If any Financed Vehicle securing a Receivable is equipped with a starter interrupt device, GPS device or other electronic device designed to aid in the location or repossession of the Financed Vehicle ("<u>Device</u>"), Originator shall, within five (5) days from the related Closing Date, take all steps necessary to transfer and assign to Agora (i) the Device, (ii) all of Originator's rights in connection with the Device, (iii) the Device's records, and (iv) all codes and/or software necessary to administer the Device.  To the extent the subscription of any Device has expired, Originator shall, at Originator's sole cost, renew such subscription for any such Device for a one (1) year period following the related Closing Date.  Originator shall provide to Obligor and obtain Obligor's valid signature on a disclosure statement regarding the GPS device (which shall be part of the related Receivable File) and Originator shall provide this signed disclosure statement to the Servicer when delivering the related Receivable File to the Servicer.  Originator understands, acknowledges and agrees that the Servicer may administer such Device in accordance with the related Receivable and pursuant to applicable law.  Originator unconditionally agrees not to activate any Device (thereby disabling or tracking said Financed Vehicle) without the prior written permission of the Portfolio Administrator.

## ARTICLE VII
## MISCELLANEOUS

**SECTION 7.1**     **Advice of Counsel**.  Originator represents that it has had the opportunity to discuss this Agreement with legal counsel and it has either discussed this Agreement with legal counsel or have opted not to discuss this Agreement with legal counsel.  Originator also agrees that it shall not deny the validity or enforceability of this Agreement on the ground that it did not have the advice of legal counsel.  Originator further agrees that any legal rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement or any addendum, amendment, or exhibits thereto.

**SECTION 7.2**     **Amendment**.  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Originator and Agora.

**SECTION 7.3**     **Waivers**.   No failure or delay on the part of Agora, the Portfolio Administrator or Originator in exercising any power, right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy.

**SECTION 7.4**     **Notices**.  All notices, demands, instructions and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including electronic mail communication), and if provided by the Originator, by an Authorized Originator Representative as set forth in Exhibit G, and shall be personally delivered or sent by certified mail, postage prepaid, by electronic mail or by overnight courier, to the intended party at the address or electronic address of such party set forth below or as set forth on the AgoraCapital Platform or at such other address or electronic address as shall be designated by the party in a written notice to the other parties hereto given in accordance with this Section.

If to Agora:          Walt, LLC
                      700 West Arkansas Lane, Ste 150

WALT Master Receivables Agreement

Arlington, TX 76103
Attention: Matt Burke
Email: █████████████████

If to Originator:    as set forth in the AgoraCapital Platform.

All notices and communications provided for hereunder shall be effective, (a) if personally delivered, when received, (b) if sent by certified mail, four (4) Business Days after having been deposited in the mail, postage prepaid and properly addressed, (c) if transmitted by electronic mail, when sent, receipt confirmed by telephone or electronic means and (d) if sent by overnight courier, two (2) Business Days after having been given to the courier unless sooner received by the addressee.

**SECTION 7.5**      **Costs and Expenses**.  Except as otherwise provided in this Agreement, Originator on the one hand, and Agora on the other, will each pay its own expenses incident to the performance of its respective obligations under the Purchase Documents.

**SECTION 7.6**      **Survival**.  The respective agreements, representations, warranties and other statements by Originator and Agora set forth in or made pursuant to this Agreement will remain in full force and effect and will survive the Closing Date and any disposition, assignment, pledge, hypothecation or other conveyance of the Conveyed Property by Agora.

**SECTION 7.7**      **Governing Law; Jurisdiction and Venue**.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY OTHERWISE APPLICABLE PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH OF THE PARTIES HERETO HEREBY AGREES TO THE EXCLUSIVE JURISDICTION OF EITHER THE COURTS OF THE STATE OF NEW YORK, LOCATED IN THE BOROUGH OF MANHATTAN, AND THE FEDERAL COURTS LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE COURTS OF THE STATE OF TEXAS, LOCATED IN TARRANT COUNTY, AND THE FEDERAL COURTS LOCATED WITHIN THE NORTHERN DISTRICT OF TEXAS. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

34

WALT Master Receivables Agreement

**SECTION 7.8**      **Counterparts.  Effect of Electronic Agreement**. This Agreement may be executed in two or more counterparts and by different parties on separate counterparts to be delivered physically, electronically, or by facsimile, each part of which will be an original, but all of which together will constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

The parties hereto intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties hereto.  In addition, the Originator and Agora hereby agree that it shall be bound by its respective electronic authorization in the same manner that it would be bound by a handwritten signature on paper records.

**SECTION 7.9**      **Further Assurances**.  Originator will, at the request of Agora or the Portfolio Administrator, execute and deliver to Agora and the Portfolio Administrator or their designees all other instruments that it may reasonably request in order to more fully effect the sale of any Receivables to Agora.

**SECTION 7.10**      **Assignment**.  Originator may not assign its rights or duties under this Agreement without the prior written consent of Agora, which consent may be given or not in the sole exclusive discretion of Agora.  Agora may freely assign this Agreement with respect to any Receivable or one or more pools of Receivables, in each case, with or without the consent of or prior notice to Originator.

**SECTION 7.11**      **Entire Agreement & Third Party Beneficiary**.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof. The Purchase Documents constitutes the entire agreement with respect to the subject matter hereof and the acquisition of related Portfolio by Agora on the related Closing Date. The Parties agree that ADI is an express third party beneficiary to this Agreement.

**SECTION 7.12**      **Confidentiality**.  The Originator and its respective affiliates, directors, officers, employees and authorized representatives shall hold in strict confidence and not use or disclose to any other person without the prior written consent of the Portfolio Administrator, all information concerning Agora's proprietary business procedures, products, services, operations, fees, policies or plans received from Agora in connection with the negotiation and performance of this Agreement and/or the AgoraCapital Platform.  Notwithstanding the foregoing, the Originator may disclose information that is required to be disclosed by applicable law, governmental regulation or court order, and may disclose the contents of this Agreement, with information as to the amount of, and manner of calculating the Purchase Price and any Obligor account numbers or other confidential Obligor information redacted where permitted, in required filings with the Securities and Exchange Commission or other governmental agency without the other party's prior consent. This provision shall survive execution of this Agreement and each Closing Date.

WALT Master Receivables Agreement

**SECTION 7.13**     <u>**Severability of Provisions**</u>.    Any part, provision, representation or warranty of this Agreement which is prohibited, or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.   Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Receivable shall not invalidate or render unenforceable such provision in any other jurisdiction.   To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.   If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

**SECTION 7.14**     <u>**No Partnership or Joint Venture; No Origination**</u>.  Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third Person to create the relationship of principal and agent, partnership, or joint venture.  Notwithstanding anything herein to the contrary, in no event shall the parties hereto, or any third Person deem or construe Agora, the Portfolio Administrator or any Issuer as the originator of the Receivables.  The timing and content of any advertisements, announcements, press releases or other promotional activity relating to this Agreement, and the use Agora's name or trademarks shall be subject to the prior written approval of Agora, which approval may be withheld by Agora in its sole discretion.

**SECTION 7.15**     <u>**Non-Public Information**</u>.   Originator represents and warrants that it maintains, and will continue to maintain, appropriate information security programs and measures designed to ensure the security and confidentiality of "nonpublic personal information" ("<u>NPI</u>") (as defined in the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.) and any rules promulgated thereunder).   Such information security programs and measures shall include appropriate procedures designed to (a) protect against anticipated threats or hazards to the security or integrity of NPI; (b) protect the security of NPI; and (c) to protect against unauthorized access to or use of NPI.  Originator further agrees that, except as may be required or allowed by law, it will not disclose any NPI to any third party and will not use NPI other than to carry out the purposes for which it was disclosed, unless another use is expressly permitted by a written agreement executed by Agora or required by law.  Agora and the Portfolio Administrator shall have access, upon reasonable notice, to review any internal and external audits and records of the other as may be reasonably necessary to assess compliance with the security provisions of this Agreement.  Originator shall promptly notify Agora or Portfolio Administrator if it receives any complaint or notice concerning a violation of privacy rights or becomes aware of a breach of customer data security.

**SECTION 7.16**     <u>**Indemnification**</u>.   Originator shall indemnify, defend and hold the Portfolio Administrator, Agora  and/or any assignees of Agora, including without limitation each Issuer, and each of their respective officers, directors, employees, members, managers, parent company, affiliates, servicers, portfolio managers, beneficiaries and representatives harmless from, against and with respect to any damage, liability, claim, loss, penalty, fine, amount paid in settlement, and any expense, including attorney's fees, and other costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for

36

WALT Master Receivables Agreement

collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this indemnity provision (collectively referred to as "Damages"), occasioned by, arising out of, or resulting from, either directly or indirectly; (i) any and all claims against and liabilities of Originator of every kind, nature and description, absolute and contingent, arising from or in any way connected with the business and operations of Originator whether occurring before or after the date of this Agreement's execution; (ii) any claims against the Portfolio Administrator, Agora and any assignees of Agora, including without limitation any Issuer, by any Obligor on a Receivable identified on a Receivable Schedule, and (iii) any untrue representation or warranty or breach of any representation or warranty or covenant of Originator contained in this Agreement.   This indemnification shall include, but not be limited to, Damages resulting from any claim or proceeding which is brought by or on behalf of one or more Obligors on the Receivables identified on a Receivable Schedule: (i) for causes of action accruing prior to the date of this Agreement and/or the related Closing Date; or (ii) based on actions or omissions by Originator on or after such date(s); and (iii) and any governmental investigation or administrative proceeding predicated upon acts committed by Originator regardless of whether such acts or investigation occurred or was commenced before or after the date of this Agreement and or the related Closing Date.   The indemnity provided by Originator shall survive the termination of this Agreement and each Closing Date and the payment and satisfaction of all Receivables identified on all Receivable Schedules.   The remedies set forth in this Section 7.16 are in addition to, and not in lieu of, any remedies provided by Section 6.4 of this Agreement.

The Originator's obligation to indemnify in this Article VII shall survive the related Closing Date and any termination of this Agreement.

**SECTION 7.17**       **No Petition**.  The Originator covenants and agrees that Originator shall not institute against, or join any other Person in instituting against, Agora, any Issuer or any of their Affiliates any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding or other proceedings under any federal or state bankruptcy or similar law.  This Section 7.17 shall survive the termination of this Agreement.

[SIGNATURES FOLLOW]

37

WALT Master Receivables Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers all as of the day and year first above written.

**WALT, LLC**
as Purchaser

By: _____ *Matt Burke* _____
Name:    Matt Burke
Title:
         Authorized
         Signatory

**ATLANTIC ACCEPTANCE CORP,**
**ATLANTIC ACCEPTANCE HOLDINGS LLC,**
**and ATLANTIC AUTO FINANCE GROUP,**
as Originator

By: _____ *Bruce Black* _____
Name:  Bruce Carl Black
Title:   Owner

**ATLANTIC ACCEPTANCE CORP,**
**ATLANTIC ACCEPTANCE HOLDINGS LLC,**
**and ATLANTIC AUTO FINANCE GROUP,**
as Originator

By: _____ *Ryan Rochefort* _____
Name:  Ryan Allen Rochefort
Title:   Owner

**MASTER RECEIVABLES AGREEMENT**
**SIGNATURE PAGE**

## EXHIBIT A

### CONTENTS OF RECEIVABLE FILES

With respect to each Receivable

(i)      the related Obligor's credit application,

(ii)     the original Contract or, if the original Contract has been lost or destroyed, a copy of the original Contract designated and certified by the Originator and the applicable Issuer as the replacement original Contract for purposes of taking possession of tangible chattel paper pursuant to Section 9-330(b) of the UCC,

(iii)    the bill of sale,

(iv)    the certificate of title and such other documents, if any, that the applicable Originator, any assignee thereof, or Servicer, pursuant to this Agreement, keeps on file in accordance with its customary procedures indicating that the Financed Vehicle is owned by the Obligor and subject to the interest of the Originator as first lienholder or secured party, or, if such Lien Certificate has not yet been received, a copy of the application, receipt or other evidence of title therefor, showing the Originator as secured party,

(v)     the voluntary debt cancellation coverage addendum or proof of insurance,

(vi)    references provided by the Obligor,

(vii)   any notice of intent to dispose of the Financed Vehicle with applicable proof of mailing,

(viii)  any notice of deficiency balance/surplus and

(ix)    such other documents as the Servicer shall keep on file in accordance with its customary procedures relating to a Receivable and as needed in order to accomplish its duties under this Agreement.

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

**EXHIBIT B**
**CONTENTS OF ELECTRONIC DATA FILE**
**[Values marked with asterisk * are required]**

| WORKSHEET | VALUES | DESCRIPTION |
|---|---|---|
| CONTRACT DATA | * PS_ACCT_NO | ACCOUNT NUMBER IN ORIGINATOR SERVICING SYSTEM |
| CONTRACT DATA | * FIRST_NAME | OBLIGOR FIRST NAME |
| CONTRACT DATA | * LAST_NAME | OBLIGOR LAST NAME |
| CONTRACT DATA | * ADDRESS | OBLIGOR CURRENT STREET ADDRESS |
| CONTRACT DATA | * CITY | OBLIGOR CURRENT CITY |
| CONTRACT DATA | * STATE | OBLIGOR CURRENT STATE |
| CONTRACT DATA | * ZIP_CODE | OBLIGOR CURRENT ZIP CODE |
| CONTRACT DATA | EMAIL_ADDRESS | OBLIGOR EMAIL ADDRESS |
| CONTRACT DATA | * SSN | OBLIGOR SOCIAL SECURITY NUMBER |
| CONTRACT DATA | DOB | OBLIGOR DATE OF BIRTH IN MM/DD/YYYY FORMAT |
| CONTRACT DATA | * HOME_PHONE | OBLIGOR CURRENT HOME PHONE NUMBER WITHOUT DASHES |
| CONTRACT DATA | * MOBILE_PHONE | OBLIGOR CURRENT MOBILE PHONE NUMBER WITHOUT DASHES |
| CONTRACT DATA | * WORK_PHONE | OBLIGOR CURRENT WORK PHONE NUMBER WITHOUT DASHES |
| CONTRACT DATA | DL_NUMBER | OBLIGOR DRIVER'S LICENSE NUMBER |
| CONTRACT DATA | * EMPLOYER_NAME | OBLIGOR CURRENT EMPLOYER |
| CONTRACT DATA | * INCOME | OBLIGOR CURRENT GROSS MONTHLY INCOME |
| CONTRACT DATA | * LENGTH | OBLIGOR CURRENT EMPLOYMENT IN YEARS AND MONTHS |
| CONTRACT DATA | * RESIDENCE | OBLIGOR CURRENT RESIDENCE STATUS: OWN, RENT, OTHER |
| CONTRACT DATA | * LENGTH | OBLIGOR CURRENT RESIDENCE IN YEARS AND MONTHS |
| CONTRACT DATA | * CREDITSCORE | OBLIGOR CURRENT CREDIT SCORE |
| CONTRACT DATA | * LOAN_TYPE | CONTRACT INTEREST ACCRUAL METHOD: DAILY SIMPLE INTEREST (SIMPLE) OR PRE COMPUTED (PRECOMP) A.K.A. RULE OF 78'S |
| CONTRACT DATA | * LOAN_ORIGINATOR | UNIQUE_ID FROM DEALER DATA TAB |
| CONTRACT DATA | * ORIGINATION_DATE | CONTRACT DATE OR ORIGINATION DATE |
| CONTRACT DATA | * AMOUNT_FINANCED | AMOUNT FINANCED |
| CONTRACT DATA | * APR | ANNUAL PERCENTAGE RATE (APR) |
| CONTRACT DATA | FINANCE_CHARGE | FINANCE CHARGE |
| CONTRACT DATA | * LOAN_TERM | NUMBER OF PAYMENTS OR CONTRACT TERM |
| CONTRACT DATA | * PMT_AMT | REGULAR PAYMENT AMOUNT |
| CONTRACT DATA | PMT_FREQUENCY | INDICATES IF REGULAR PAYMENTS ARE SCHEDULED ONCE A MONTH (MONTHLY) |
| CONTRACT DATA | MATURITY_DATE | DATE OF LAST REGULAR MONTHLY PAYMENT OR MATURITY DATE |
| CONTRACT DATA | * FIRST_PRN_PMT_DT | DATE OF FIRST REGULAR MONTHLY PAYMENT |
| CONTRACT DATA | * NEXT_PRN_PMT_DT | DATE OF THE NEXT REGULAR SCHEDULED PAYMENT |
| CONTRACT DATA | * LOAN_PAYOFF | ACCOUNT PAYOFF AS OF THE INTEREST ACCRUED THROUGH DATE (CUT-OFF DATE) |

WALT Master Receivables Agreement

| WORKSHEET | VALUES | DESCRIPTION |
|---|---|---|
| CONTRACT DATA | * PRINCIPLE_BAL | PRINCIPAL BALANCE AS OF THE INTEREST ACCRUED THROUGH DATE (CUT-OFF DATE) |
| CONTRACT DATA | * ACCRUED_INT_AMT | INTEREST BALANCE AS OF THE PORTFOLIO SALE DATE: THE AMOUNT OF INTEREST THAT HAS ACCRUED FROM THE LAST PAYMENT TO THE INTEREST ACCRUED THROUGH DATE (CUT-OFF DATE) |
| CONTRACT DATA | CURR_LATE_CHARGES | LATE CHARGES OWED AS OF THE INTEREST ACCRUED THROUGH DATE (CUT-OFF DATE) |
| CONTRACT DATA | * LAST_PMT_AMT | AMOUNT OF LAST PAYMENT |
| CONTRACT DATA | * LAST_PMT_DT | DATE OF LAST PAYMENT |
| CONTRACT DATA | * TOTAL_PMTS_COUNT | TOTAL NUMBER OF REGULAR PAYMENTS MADE |
| CONTRACT DATA | * JURISDICTION | STATE WHERE CONTRACT ORIGINATED |
| CONTRACT DATA | * GAP_$ | AMOUNT PAID FOR GAP INSURANCE |
| CONTRACT DATA | * WARRANTY_$ | AMOUNT PAID FOR VEHICLE WARRANTY |
| CONTRACT DATA | * PAYMENT | DOWN PAYMENT |
| CONTRACT DATA | * PURCHASE_DISCOUNT_AMOUNT | THE BALANCE OF THE PURCHASE DISCOUNT AS OF THE INTEREST ACCRUED THROUGH DATE (CUT-OFF DATE) |
| CONTRACT DATA | * PUR_BALANCE | ACCOUNT BALANCE PURCHASED BY AGORA |
| CONTRACT DATA | * PUR_PRICE | PRICE PAID FOR RECEIVABLE (AFTER DISCOUNT) |
| CONTRACT DATA | REGISTERED_ST | THE STATE WHERE THE VEHICLE IS REGISTERED |
| CONTRACT DATA | * VIN | VEHICLE IDENTIFICATION NUMBER (VIN) |
| CONTRACT DATA | * YEAR | VEHICLE MODEL YEAR |
| CONTRACT DATA | * MAKE | VEHICLE MAKE |
| CONTRACT DATA | * MODEL | VEHICLE MODEL |
| CONTRACT DATA | * CASH_PRICE | CASH PRICE OF VEHICLE |
| CONTRACT DATA | COLOR | VEHICLE COLOR |
| CONTRACT DATA | MILEAGE | VEHICLE MILEAGE |
| CONTRACT DATA | * VALUE | VEHICLE VALUE |
| CONTRACT DATA | * VALUATION_DATE | VALUATION DATE |
| CONTRACT DATA | * VALUATION_METHOD | SOURCE OF VEHICLE VALUE: BLACK BOOK USA, ORIGINATOR PROVIDED |
| CONTRACT DATA | LICENSE_PLATE | LICENSE PLATE NUMBER |
| CONTRACT DATA | * TITLE_NUMBER | TITLE NUMBER |
| CONTRACT DATA | TITLE_STATUS | CURRENT LIEN PERFECTION STATUS:  0 = NOT RECEIVED, 1 = SUBMITTED, 2 = PERFECTED, 3 = RECEIVED NEEDS ATTENTION, 4 = RECEIVED, 5 = RELEASED, 6 = OTHER |
| CONTRACT DATA | TRACKING_DEVICE | TRACKING DEVICE NUMBER, IF THE VEHICLE IS EQUIPPED WITH A GPS TRACKING DEVICE. |
| CO-OBLIGOR DATA | * PS_ACCT_NO | ACCOUNT NUMBER IN ORIGINATOR SERVICING SYSTEM |
| CO-OBLIGOR DATA | * RELATIONSHIP | CO-OBLIGOR RELATIONSHIP TO OBLIGOR: SPOUSE, HUSBAND, WIFE, PARENT, SIBLING, OTHER |
| CO-OBLIGOR DATA | * FIRST_NAME | CO-OBLIGOR FIRST NAME |
| CO-OBLIGOR DATA | * LAST_NAME | CO-OBLIGOR LAST NAME |
| CO-OBLIGOR DATA | * ADDRESS | CO-OBLIGOR CURRENT STREET ADDRESS |
| CO-OBLIGOR DATA | * CITY | CO-OBLIGOR CURRENT CITY |
| CO-OBLIGOR DATA | * STATE | CO-OBLIGOR CURRENT STATE |
| CO-OBLIGOR DATA | * ZIP_CODE | CO-OBLIGOR CURRENT ZIP CODE |

WALT Master Receivables Agreement

| WORKSHEET | VALUES | DESCRIPTION |
|---|---|---|
| CO-OBLIGOR DATA | EMAIL_ADDRESS | CO-OBLIGOR EMAIL ADDRESS |
| CO-OBLIGOR DATA | * SSN | CO-OBLIGOR SOCIAL SECURITY NUMBER |
| CO-OBLIGOR DATA | DOB | CO-OBLIGOR DATE OF BIRTH IN MM/DD/YYYY FORMAT |
| CO-OBLIGOR DATA | HOME_PHONE | CO-OBLIGOR CURRENT HOME PHONE NUMBER WITHOUT DASHES |
| CO-OBLIGOR DATA | MOBILE_PHONE | CO-OBLIGOR CURRENT MOBILE PHONE NUMBER WITHOUT DASHES |
| CO-OBLIGOR DATA | WORK_PHONE | CO-OBLIGOR CURRENT WORK PHONE NUMBER WITHOUT DASHES |
| CO-OBLIGOR DATA | DL_NUMBER | CO-OBLIGOR DRIVER'S LICENSE NUMBER |
| CO-OBLIGOR DATA | EMPLOYER_NAME | CO-OBLIGOR CURRENT EMPLOYER |
| PAYMENTS | * PS_ACCT_NO | ACCOUNT NUMBER IN ORIGINATOR SERVICING SYSTEM |
| PAYMENTS | * PMT_NUMBER | UNIT PERIOD THE PAYMENT WAS MADE; FIRST PAYMENT=1, SECOND PAYMENT=2, ETC. |
| PAYMENTS | DATE_DUE | DATE PAYMENT DUE |
| PAYMENTS | * DATE_PAID | DATE PAYMENT MADE |
| PAYMENTS | PMT_DESC | HOW PAYMENT MADE |
| PAYMENTS | * PMT_AMT | AMOUNT OF PAYMENT. NEGATIVE AMOUNTS SHOULD BE EXCLUDED. |
| PAYMENTS | REFERENCE | PAYMENT REFERENCE |
| DEALER DATA | UNIQUE_ID | UNIQUE IDENTIFIER |
| DEALER DATA | COMPANY_NAME | DEALER LEGAL NAME |
| DEALER DATA | CONTACT_SAL | MR OR MRS |
| DEALER DATA | CONTACT_FIRST_NAME | PRIMARY CONTACT FIRST NAME |
| DEALER DATA | CONTACT_LAST_NAME | PRIMARY CONTACT LAST NAME |
| DEALER DATA | CONTACT_TITLE | PRIMARY CONTACT TITLE |
| DEALER DATA | COMPANY_STREET_ADDR | DEALER CURRENT STREET ADDRESS |
| DEALER DATA | CITY | DEALER CURRENT CITY |
| DEALER DATA | STATE | DEALER CURRENT STATE |
| DEALER DATA | ZIP_CODE | DEALER CURRENT ZIP CODE |
| DEALER DATA | CONTACT_EMAIL | PRIMARY CONTACT EMAIL ADDRESS |
| DEALER DATA | CONTACT_PHONE | PRIMARY CONTACT PHONE NUMBER |
| OBLIGOR REFERENCES | PS_ACCT_NO | ACCOUNT NUMBER IN ORIGINATOR SERVICING SYSTEM |
| OBLIGOR REFERENCES | REF_RELATONSHIP | REFERENCE RELATIONSHIP TO OBLIGOR |
| OBLIGOR REFERENCES | REF_FIRST_NAME | REFERENCE FIRST NAME |
| OBLIGOR REFERENCES | REF_LAST_NAME | REFERENCE LAST NAME |
| OBLIGOR REFERENCES | REF_ADDRESS | REFERENCE CURRENT STREET ADDRESS |
| OBLIGOR REFERENCES | REF_CITY | REFERENCE CURRENT CITY |
| OBLIGOR REFERENCES | REF_STATE | REFERENCE CURRENT STATE |
| OBLIGOR REFERENCES | REF_ZIP_CODE | REFERENCE CURRENT ZIP CODE |
| OBLIGOR REFERENCES | REF_EMAIL_ADDRESS | REFERENCE EMAIL ADDRESS |
| OBLIGOR REFERENCES | REF_HOME_PHONE | REFERENCE HOME PHONE |
| OBLIGOR REFERENCES | REF_MOBILE_PHONE | REFERENCE MOBILE PHONE |
| OBLIGOR REFERENCES | REF_WORK_PHONE | REFERENCE WORK PHONE |
| COLLECTION NOTES | PS_ACCT_NO | ACCOUNT NUMBER IN ORIGINATOR SERVICING SYSTEM |
| COLLECTION NOTES | NOTE_DATE | DATE COLLECTION NOTE OR COMMENT CREATED |

WALT Master Receivables Agreement

| WORKSHEET | VALUES | DESCRIPTION |
|---|---|---|
| COLLECTION NOTES | COMMENT_DESC | COMMENT DESCRIPTION |
| COLLECTION NOTES | COMMENT | COLLECTION NOTE OR COMMENT TEXT |
| PURCHASE PRICE (AGGREGATE) | | AGGREGATE PURCHASE PRICE OF PORTFOLIO |
| PURCHASE PRICE (LOAN-LEVEL) | | LOAN-LEVEL PURCHASE PRICE OF RECEIVABLE |

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

## EXHIBIT C

### FORM OF NOTICE OF TRANSFER
### TO BE SENT TO OBLIGOR

Date

Debtor – First name Last name
Debtor – Address
Debtor – City, State Zip

**Account Number**:

Dear First name Last name,

Please be advised that on September 28, 2022, your contract with "[ORIG KNOWN AS NAME]", was sold and assigned to WALT, LLC and will be serviced by WESTLAKE SERVICES, LLC.  Please be assured that this is a routine transaction and in no way affects the terms of your loan.  Any payments received from you after [CUTOFF DATE],will be endorsed and forwarded to WESTLAKE SERVICES, LLC.

You will receive a "Welcome Letter" from WESTLAKE SERVICES, LLC  on behalf of WALT, LLC providing you important account and contact information.

Effective [CUTOFF DATE], your future payments should be made payable to WESTLAKE SERVICES, LLC and mailed to the following address:

> WESTLAKE SERVICES, LLC.
> 4751 Wilshire Blvd, Suite 100
> Los Angeles, CA 90010

If you should have any questions concerning this transfer, please contact "[ORIG KNOWN AS NAME]'s" Customer Service at [ORIG CUSTOMER PHONE NUMBER].

Sincerely,

[ORIG KNOWN AS NAME]

WALT Master Receivables Agreement

EXHIBIT D

**LIMITED POWER OF ATTORNEY**

KNOW EVERYONE BY THESE PRESENTS, which are intended to constitute a Limited Power of Attorney, THAT **ATLANTIC ACCEPTANCE CORP,** a Florida corporation, having an office at 700 S. Rosemary Square #204-B55, West Palm Beach, FL 33401, **ATLANTIC ACCEPTANCE HOLDINGS LLC**, a Florida limited liability company, and **ATLANTIC AUTO FINANCE GROUP**, a Florida corporation ("ORIGINATOR"), hereby makes, constitutes and appoints WESTLAKE SERVICES, LLC ("AGORA'S AGENT"), on behalf of Walt, LLC, and its officers and authorized agents, and/or their successors in office, having an address at 700 W. Arkansas Lane, Suite 150, Arlington, Texas 76013, and any of its assigns, and any other entity owned or controlled by Agora Data, Inc. and its officers and authorized agents, and/or their successors in office, and any of their assigns (collectively, "AGORA PURCHASER") as its attorney-in-fact TO ACT in ORIGINATOR'S, place and stead in the following manner, as if it were present and acting through one of its duly authorized officers, and to the extent that it is permitted by law to act through an agent:

1. To endorse checks and other negotiable instruments that are made payable to ORIGINATOR and that are for payments made by Obligors on motor vehicle retail installment sales contracts and promissory notes purchased from ORIGINATOR by or on behalf of AGORA PURCHASER. Such endorsements may be made in any manner deemed appropriate by AGORA'S AGENT (provided, however, that any such endorsement shall indicate that it is made without recourse).

2. To execute, to the extent necessary by reason of lost, misplaced, damaged or destroyed original documentation, lost promissory note affidavits or their equivalent in connection with any applicable Receivables that were purchased from ORIGINATOR by AGORA PURCHASER, as evidenced by the Master Receivables Agreement, dated September 28, 2022, by and between the Originator and Walt, LLC, and the AgoraCapital Platform (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "MRA").

3. To endorse, assign, transfer, file and record Certificates of Title to the Financed Vehicles, Contracts, and security agreements which are the subject of the Receivables sold by ORIGINATOR to AGORA PURCHASER pursuant to the MRA.

4. To take possession of Financed Vehicles, for any purpose, subject to Contracts.

To induce any third party to act hereunder, ORIGINATOR hereby agrees that any third party receiving a duly executed copy or facsimile of this Limited Power of Attorney may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination has been received by such third party.

Capitalized terms not defined herein shall have the meanings ascribed to them in the MRA.

[SIGNATURE AND NOTARY FOLLOWS]

WALT Master Receivables Agreement

IN WITNESS THEREOF, Originator has executed this Limited Power of Attorney this 28th day of September 2022, by and through its duly authorized officer.

ATLANTIC ACCEPTANCE CORP,
ATLANTIC ACCEPTANCE HOLDINGS LLC,
and ATLANTIC AUTO FINANCE GROUP,
as Originator

By: _____*Bruce Black*_____
Name: Bruce Carl Black
Title:  Owner


ATLANTIC ACCEPTANCE CORP,
ATLANTIC ACCEPTANCE HOLDINGS LLC,
and ATLANTIC AUTO FINANCE GROUP,
as Originator

By: _____*Ryan Rochefort*_____
Name: Ryan Allen Rochefort
Title:  Owner


State of [_____]            §
                                      §
County of [_____]           §


The foregoing instrument was acknowledged before me on this [___] day of [_____] 2022 by Bruce Carl Black and Ryan Allen Rochefort who is personally known to me or satisfactorily established his/her identity to me, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____

WALT Master Receivables Agreement

Notary Public

My Commission expires on _____

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

**EXHIBIT E**

**FORM OF RELEASE**

**[ON PRIOR LENDER'S LETTERHEAD]**

DATE]

Walt, LLC

[_____]
[_____]
[_____]

To Whom It May Concern:

Upon confirmation of receipt of the sum of $_____ by the close of business on September 28, 2022, to [PRIOR LENDER] (hereinafter "Lender") account number _____ for the benefit of [ORIGINATOR], the Lender hereby releases all security interests, rights, liens or claims of any kind it may have with respect to the schedule of Receivables set forth on Schedule 1 attached hereto and Lender will immediately undertake the following actions with respect to the attached files:

1. Execute and file appropriate UCC releases releasing any security interest Lender may have in the Contracts, Financed Vehicles and corresponding Certificates of Title listed on the attached.

2. Terminate all applicable security agreements.

3. Deliver by overnight courier service to [the Servicer][Portfolio Administrator] at the below address, all original documents in Lender's possession with respect to the Receivables purchased by Agora, including, without limitation, original retail installment sales Contracts and original certificates of title.

        [Servicer][Portfolio Administrator]

        [_____]
        [_____]
        [_____]

The undersigned person(s) executing this letter agreement on behalf of [LENDER] is/are representative(s), agent(s), officer(s), and/or employee(s) of [LENDER] and execute(s) this letter agreement on behalf of [LENDER] having all of the requisite, necessary and proper legal authority as an authorized representative of [LENDER] to execute this letter agreement and obligate and bind [LENDER] to its terms.

Sincerely,

By: _____

WALT Master Receivables Agreement

Name: _____
Its: _____

WALT Master Receivables Agreement

SCHEDULE 1 TO EXHIBIT E

LIST OF RECEIVABLES

[to be attached]

WALT Master Receivables Agreement

Document Ref: KXYJK-MCSZT-BGYUW-47TV6

## **EXHIBIT F**

### **ACH Withdrawal Authorization Agreement Form**

ACH Payments is a service offered by Agora Data, Inc. ("Agora") whereby funds are electronically withdrawn from your checking or savings account and applied to your Agora account under the Master Receivables Agreement.

Completing this ACH withdrawal Authorization Agreement with enroll for ACH:

| ACCOUNT DETAILS | BANK ACCOUNT DETAILS - PROVIDED TO CUSTOMER SERVICE |
|---|---|
| Originator Name:<br>ATLANTIC ACCEPTANCE CORP,<br>ATLANTIC ACCEPTANCE HOLDINGS<br>LLC, and ATLANTIC AUTO FINANCE<br>GROUP | Name of Financial Institution: ▓▓▓ |
| | Name on Checking/Savings Account: ▓▓▓ |
| Financial Institution Address:<br><br>501 S Flagler Dr | Bank Routing Number: ▓▓▓ |
| | Bank Account Number: ▓▓▓ |
| | ☑ Checking Account    ☐ Savings Account |
| City:  West Palm Beach | Account Holder Signature: _Ryan Rochefort_ |
| State:  FL | |
| ZIP:  33401 | Date:  Sep 30, 2022 |
| Originator Accounting Dept. Email address:<br>▓▓▓ | Account Signor Name:<br><br>Ryan Rochefort |

*By signing this ACH Withdrawal Authorization Agreement, I hereby request and authorize Agora Data, Inc. to initiate withdrawals from the checking account named above, or to draw by electronic transfer from the checking account named above, funds payable to Agora. This authorization covers all obligations as expressly stated in the Master Receivables Agreement with Agora. Agora's bank and Agora reserve the right to terminate this program and/ or Originator's participation therein at any time. **This authorization does not replace nor limit any obligation of the Originator as stated in the Master Receivables Agreement and any Agora Data Inc. originator policy.***

WALT Master Receivables Agreement

**EXHIBIT G**

**List of Authorized Originator Representatives**

**ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS LLC, and ATLANTIC AUTO FINANCE GROUP** hereby authorizes the following individual(s) to receive and deliver information, notices and instructions on behalf of Originator, either verbally or in writing, and sign documents related to this Agreement and such individuals have the authority to otherwise bind and obligate the Originator.

This authorization shall remain in full force and effect until termination of this Agreement:

| Bruce  Blavk | *Bruce Black* |
|---|---|
| Printed Name/Title | Signature |
| ███████████ | 561-602-0070 |
| Email | Phone Number |
| | *Bruce Black* |
| Printed Name/Title | Signature |
| | |
| Email | Phone Number |
| | |
| Printed Name/Title | Signature |
| | |
| Email | Phone Number |

WALT Master Receivables Agreement

_____

Printed Name/Title

_____

Signature

_____

Email

_____

Phone Number

WALT Master Receivables Agreement

**EXHIBIT H**

**ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS LLC, and ATLANTIC AUTO FINANCE GROUP** *has directed Agora to deliver any amounts distributable to Originator by Agora under the Agreement to the account set forth below*

DEPOSIT ACCOUNT.  The deposit account into which Agora shall deposit amounts as stated on within the Master Receivables Agreement and AgoraCapital Platform hereunder via wire transfer as follows:

| ACH – Bank Instructions | |
|---|---|
| Bank Name: | ██████████ |
| Name on Bank Account: | ████████████ |
| Routing Number (ABA): | ████████ |
| Account Number: | ████████ |

| Wire – Bank Instructions | |
|---|---|
| Bank Name: | ████ |
| Name on Bank Account: | ████████████ |
| Routing Number (ABA): | ████████ |
| Account Number: | ████████ |

**ATLANTIC ACCEPTANCE CORP,**
**ATLANTIC ACCEPTANCE HOLDINGS LLC,**
**and ATLANTIC AUTO FINANCE GROUP,**
as Originator

By: *Bruce Black*
_____
Name: Bruce Carl Black
Title:  Owner

WALT Master Receivables Agreement

**ATLANTIC ACCEPTANCE CORP,**
**ATLANTIC ACCEPTANCE HOLDINGS LLC,**
**and ATLANTIC AUTO FINANCE GROUP,**
as Originator

By:     *Ryan Rochefort*
_____
Name: Ryan Allen Rochefort
Title:   Owner

WALT Master Receivables Agreement

## EXHIBIT I-1

Limited Personal Guaranty

For good and valuable consideration received, the undersigned does hereby absolutely, irrevocably, and unconditionally guarantee the obligation to deliver, prior to any Closing Date, for all Receivables subject to such Closing Date, (1) the original Contract or, if the original Contract has been lost or destroyed, a copy of the original Contract designated and certified by the Originator as the replacement original Contract for purposes of taking possession of tangible chattel paper pursuant to Section 9-330(b) of the UCC, and (2) the certificate of title and such other documents, if any, that the applicable Originator, any assignee thereof, or Servicer, pursuant to this Agreement, keeps on file in accordance with its customary procedures indicating that the Financed Vehicle is owned by the Obligor and subject to the interest of the Originator as first lienholder or secured party, or, if such Lien Certificate has not yet been received, a copy of the application, receipt or other evidence of title therefor, showing the Originator as secured party, as set forth under the Master Receivables Agreement, dated as of September 28, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and among **ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS LLC, and ATLANTIC AUTO FINANCE GROUP** (the "Originator") and Walt, LLC, according to its terms to the same extent as if the undersigned were Originator under the foregoing Agreement.  The undersigned hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Agora under the Agreement, and waives diligence, presentment and suit on the part of Agora in the enforcement of any liability, obligation or duty guaranteed hereby.  The undersigned also waives any notice of; defense based on; and hereby consents to all amendments, modifications, extensions of the Agreement and hereby consents to the assignment of the Agreement to any third party.  This is an unconditional, absolute, continuing guaranty of performance of the above-referenced delivery obligations and it is an agreement of guaranty, not of suretyship.  The undersigned waives all requirements of law, if any, that any efforts be made against Originator or that any action be brought against Originator before resorting to this guaranty.  The undersigned agrees that if Agora shall employ an attorney to present, enforce or defend all of Agora's rights or remedies hereunder, the undersigned shall pay any reasonable attorney's fees incurred by Agora in connection therewith.  This agreement shall be binding upon the undersigned and his or her successors, heirs, executors and administrators, and shall inure to the benefit of Agora and Agora's successors and assigns.

THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.  THIS GUARANTY IS PERFORMABLE IN TARRANT COUNTY, TEXAS.  GUARANTOR AGREES THAT TARRANT COUNTY, TEXAS SHALL BE THE EXCLUSIVE VENUE FOR LITIGATION OF ANY DISPUTE OR CLAIM ARISING OR RELATED TO THIS GUARANTY AND THAT SUCH COUNTY IS A CONVENIENT FORUM IN WHICH TO DECIDE ANY SUCH DISPUTE OR CLAIM.  GUARANTOR FURTHER CONSENTS TO THE PERSONAL JURISDICTION OF THE STATE OF TEXAS AND TO THE STATE DISTRICT OR COUNTY COURTS LOCATED IN TARRANT COUNTY, TEXAS.  **THE UNDERSIGNED HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER.**

By: _____  *Bruce Black*

Name:       Bruce Carl Black

WALT Master Receivables Agreement

Date: _____ Sep 30, 2022 _____

Address: _____ 700 rosemary abe _____

West palm beach  fl _____

Phone: _____ 561-602-0070 _____

Email: _____ █████████████ _____

WALT Master Receivables Agreement

## EXHIBIT I-2

Limited Personal Guaranty

For good and valuable consideration received, the undersigned does hereby absolutely, irrevocably, and unconditionally guarantee the obligation to deliver, prior to any Closing Date, for all Receivables subject to such Closing Date, (1) the original Contract or, if the original Contract has been lost or destroyed, a copy of the original Contract designated and certified by the Originator as the replacement original Contract for purposes of taking possession of tangible chattel paper pursuant to Section 9-330(b) of the UCC, and (2) the certificate of title and such other documents, if any, that the applicable Originator, any assignee thereof, or Servicer, pursuant to this Agreement, keeps on file in accordance with its customary procedures indicating that the Financed Vehicle is owned by the Obligor and subject to the interest of the Originator as first lienholder or secured party, or, if such Lien Certificate has not yet been received, a copy of the application, receipt or other evidence of title therefor, showing the Originator as secured party, as set forth under the Master Receivables Agreement, dated as of September 28, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and among **ATLANTIC ACCEPTANCE CORP, ATLANTIC ACCEPTANCE HOLDINGS LLC, and ATLANTIC AUTO FINANCE GROUP** (the "Originator") and Walt, LLC, according to its terms to the same extent as if the undersigned were Originator under the foregoing Agreement. The undersigned hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Agora under the Agreement, and waives diligence, presentment and suit on the part of Agora in the enforcement of any liability, obligation or duty guaranteed hereby. The undersigned also waives any notice of; defense based on; and hereby consents to all amendments, modifications, extensions of the Agreement and hereby consents to the assignment of the Agreement to any third party. This is an unconditional, absolute, continuing guaranty of performance of the above-referenced delivery obligations and it is an agreement of guaranty, not of suretyship. The undersigned waives all requirements of law, if any, that any efforts be made against Originator or that any action be brought against Originator before resorting to this guaranty. The undersigned agrees that if Agora shall employ an attorney to present, enforce or defend all of Agora's rights or remedies hereunder, the undersigned shall pay any reasonable attorney's fees incurred by Agora in connection therewith. This agreement shall be binding upon the undersigned and his or her successors, heirs, executors and administrators, and shall inure to the benefit of Agora and Agora's successors and assigns.

THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THIS GUARANTY IS PERFORMABLE IN TARRANT COUNTY, TEXAS. GUARANTOR AGREES THAT TARRANT COUNTY, TEXAS SHALL BE THE EXCLUSIVE VENUE FOR LITIGATION OF ANY DISPUTE OR CLAIM ARISING OR RELATED TO THIS GUARANTY AND THAT SUCH COUNTY IS A CONVENIENT FORUM IN WHICH TO DECIDE ANY SUCH DISPUTE OR CLAIM. GUARANTOR FURTHER CONSENTS TO THE PERSONAL JURISDICTION OF THE STATE OF TEXAS AND TO THE STATE DISTRICT OR COUNTY COURTS LOCATED IN TARRANT COUNTY, TEXAS. **THE UNDERSIGNED HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER.**

By: _____  *Ryan Rochefort*

Name:      Ryan Allen Rochefort

WALT Master Receivables Agreement

Date: **Sep 30, 2022**

Address: **700 S Rosemary Av**

**West Palm Beach**

Phone: **561-820-7361**

Email: ████████████████

WALT Master Receivables Agreement

# Signature Certificate

Reference number: KXYJK-MCSZT-BGYUW-47TV6

| Signer | Timestamp | Signature |
|---|---|---|

**Bruce Black**
Email: bb@atlanticafg.com

| | |
|---|---|
| Sent: | 30 Sep 2022 02:44:21 UTC |
| Viewed: | 30 Sep 2022 02:45:21 UTC |
| Signed: | 30 Sep 2022 13:50:23 UTC |

**Recipient Verification:**
✔Email verified          30 Sep 2022 02:45:21 UTC

*Bruce Black*

IP address: ▮▮▮▮▮▮
Location: Orlando, United States

---

**Ryan Rochefort**
Email: ryanr@atlanticafg.com

| | |
|---|---|
| Sent: | 30 Sep 2022 02:44:21 UTC |
| Viewed: | 30 Sep 2022 13:51:10 UTC |
| Signed: | 30 Sep 2022 16:48:38 UTC |

**Recipient Verification:**
✔Email verified          30 Sep 2022 13:51:10 UTC

*Ryan Rochefort*

IP address: ▮▮▮▮▮▮
Location: Delray Beach, United States

---

**Matt Burke**
Email: matt.burke@agoradata.com

| | |
|---|---|
| Sent: | 30 Sep 2022 02:44:21 UTC |
| Viewed: | 30 Sep 2022 16:49:14 UTC |
| Signed: | 30 Sep 2022 17:59:45 UTC |

**Recipient Verification:**
✔Email verified          30 Sep 2022 16:49:14 UTC

*Matt Burke*

IP address: ▮▮▮▮▮▮
Location: Arlington, United States

Document completed by all parties on:
30 Sep 2022 17:59:45 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.

